STATE of Minnesota, Respondent,

v.

Vincent Stephen BAUER, Appellant.

No. C3–98–786.

Supreme Court of Minnesota.

July 29, 1999.

John M. Stuart, State Public Defender, Ann Brom McCaughan, Asst. State Public Defender, Minneapolis, for appellant.

Michael A. Hatch, Atty. Gen., Susan Gaertner, Ramsey County Atty., Mark Nathan Lystig, Asst. Ramsey County Atty., St. Paul, for respondent.

## OPINION

GILBERT, Justice.

Following a jury trial in Ramsey County District Court, appellant, Vincent Stephen Bauer, was found guilty of first-degree premeditated murder and second-degree intentional murder for the 1996 killing of his estranged wife. On this direct appeal, appellant asks us to review several of the trial court's evidentiary rulings for abuse of discretion. He also asks us to determine whether the evidence presented at trial was sufficient to support the jury's verdict. We affirm.

The facts of this case are as follows: In the early morning hours of March 20, 1996, 5–year–old Jonathan Bauer knocked on the back door of his neighbors' house in Saint Paul. After being let into the house, Jonathan told his neighbor that something was wrong with his mother, Susan Bauer. The neighbor's husband went next door to investigate.

The front door to Ms. Bauer's house was open and a set of keys was in the outside lock. Upon entering the house, the neighbor found appellant, Ms. Bauer's estranged husband, standing in the doorway between the living room and kitchen with appellant's and Ms. Bauer's other two children. He then saw Ms. Bauer, obviously injured or dead, lying on a sofa bed in the living room. The neighbor called 911 from the phone in Ms. Bauer's kitchen. The paramedics arrived at Ms. Bauer's house shortly thereafter. After briefly examining Ms. Bauer, they concluded that she was already dead.

Saint Paul police and Dr. Michael McGee, an Assistant Ramsey County Med-

ical Examiner, were called to the scene. They found Ms. Bauer on the sofa bed in the living room. A telephone cord and a metal coat hanger had been wrapped tightly around her neck. In addition to the injuries caused by these ligatures, investigators observed multiple soft tissue injuries on Ms. Bauer's face, neck, chest, and hands, and an L-shaped abrasion on her left calf. After conducting an autopsy, Dr. McGee determined that the cause of Ms. Bauer's death was "[a]sphyxia due to ligature strangulation" and that Ms. Bauer was most likely killed between 10:00 p.m. on March 19 and 12:00 midnight on March 20, 1996.

Appellant did not testify at trial, but in several interviews with police gave his version of the events surrounding Ms. Bauer's killing. Appellant and Ms. Bauer began dating in 1984, were married in 1988, and separated in early 1996. They had three children. In January 1996, Ms. Bauer filed for and was granted an order for protection prohibiting appellant from having contact with her. Despite this order, Ms. Bauer willingly continued to have contact with appellant and permitted him to have contact with the children.

Appellant said that he was at Ms. Bauer's house on the afternoon of March 19, 1996 but left at approximately 2:30 p.m. He said that from there, he went to a dentist's office in Newport where Ms. Bauer had a dentist appointment. Appellant stated that from the dentist's office, he went to a shopping mall in West Saint Paul where he purchased clothes for his children and then went to a bar in North Saint Paul where he played pool until late in the night. After leaving the bar, he went to the trailer home of a friend in Oakdale, where he was residing. One of the other tenants of the trailer confirmed that appellant returned there at approximately 12:15 a.m. on March 20.

Appellant said that he went to Ms. Bauer's house on the morning of March 20 to drop off the clothes he had purchased for his children. According to appellant,

when he arrived at Ms. Bauer's house he saw the front door open. Appellant said that he then entered the house and saw Ms. Bauer lying on the sofa bed. He touched Ms. Bauer's face to see if she was all right, but found that she was already dead. Appellant said that he then sent one of his children to the neighbor's house for help while he got the other children dressed.

When asked if he knew who had killed his wife, appellant told the police that he suspected Quang Tran, the boyfriend of Rebecca Haas, a friend of Ms. Bauer's. Appellant suggested that Tran was upset with Ms. Bauer for interfering in Tran's and Haas' relationship.

At appellant's trial, the jury heard of several instances of Tran's past violent behavior. Both the defense and the state placed particular emphasis on the events of March 17, 1996, two to three days before Ms. Bauer's killing. On that date, Tran called Ms. Bauer's house several times looking for Haas. When Ms. Bauer informed him that Haas was not there, Tran became angry and threatened to kill both Haas and Ms. Bauer. Ms. Bauer then called the police, who arrived and took a statement from Ms. Bauer. Sometime after the phone calls, Haas and her children arrived at Ms. Bauer's house for dinner. After dinner, as Haas was preparing to leave, Tran arrived at Ms. Bauer's house and began smashing the windows of Haas' car with a hammer. Ms. Bauer called the police, but Tran fled before they arrived. Haas gave the police Tran's address, but Tran was not at home when officers went there to investigate.

According to police records, at 11:45 p.m. that same evening, Ms. Bauer called 911 and reported having just heard a window break in the front of her house. Police records indicate that an officer was dispatched to Ms. Bauer's house at 11:53 p.m. and arrived at 11:56 p.m. The officer discovered that a piece of brick with a note

attached had been thrown through Ms. Bauer's window. The unsigned note read:

My Family not you bisness. You F**k with me to much time. My kid say you no have husband no mor So you lonely me and my Friend come F**k you OK? He have long hair you like him. you stay away bich or I F**k you OK. I not joking.

Ms. Bauer said that she suspected Tran had written the note. The officer attempted to locate Tran at Haas' house, but Tran was not there.

On the morning of March 20, after discovering Ms. Bauer's body, the police located Tran and interviewed him in connection with the March 17 brick throwing incident and Ms. Bauer's killing. Tran told the officers that he was at work from approximately 11:00 p.m. on March 17 to approximately 7:00 a.m. on March 18. Tran's employer verified that computer records from March 17 indicated that Tran's electronic access card had been used at Tran's place of employment multiple times during that time period. As for the evening of Ms. Bauer's killing, March 19, Tran told the police that he was at home watching videos.

Tran was arrested but was released shortly thereafter because of a lack of evidence. Prior to releasing Tran, the police obtained a blood sample, searched his residence, and seized his jacket, which appeared to have a small amount of blood on the sleeve.

From Ms. Bauer's house, the police seized several pieces of evidence including the sheets from the sofa bed, a piece of cardboard that had been lying on or near the sofa bed, and samples of what appeared to be blood from the wall and floor of a bedroom adjoining the room where Ms. Bauer's body was found. The police also took samples of what appeared to be blood from several locations on Ms. Bauer's body.

With appellant's consent, the police searched his residence and obtained blood, hair, and saliva samples from him. In appellant's residence, the police found and seized a pair of men's underwear with what appeared to be blood on it. In the course of their investigation the police also seized three leg braces—two for the right leg and one for the left leg—that belonged to appellant. Appellant had polio as a child and needed the braces to walk.

Tests conducted by the Minnesota Bureau of Criminal Apprehension (BCA) showed the presence of blood on the piece of cardboard, sheets, wall sample, and floor scraping taken from Ms. Bauer's house as well as on several swabs from Ms. Bauer's body. Tests also confirmed the presence of blood on Tran's jacket sleeve and on the underwear taken from appellant's residence. No blood was discovered on any of the leg braces.

The BCA conducted DNA testing of the blood. The sample from Tran's jacket yielded no interpretable results. DNA from the blood on appellant's underwear "matched" Ms. Bauer's DNA profile. A BCA analyst testified that such a profile occurs in approximately 1 in 339,000 Caucasians. At least some of the DNA from the samples from Ms. Bauer's right hand, her left hand, the sheets, the cardboard, and the wall also matched Ms. Bauer's DNA profile. Tests indicated that some of these items also contained the blood of a second person. Neither Tran nor appellant could be positively identified as the source of any of the blood on any of these samples. According to the BCA, however, Tran, but not appellant, could be excluded as the second source of blood on the sample from Ms. Bauer's left hand.

Dr. McGee's autopsy revealed additional evidence linking appellant to Ms. Bauer's killing. During the autopsy, Dr. McGee observed and photographed an L-shaped abrasion on Ms. Bauer's left calf that had been inflicted near the time of Ms. Bauer's death. Subsequent to his autopsy, Dr. McGee compared the scaled photograph of this abrasion to the hinges of the right leg braces seized from appellant. From this

comparison, Dr. McGee concluded that the L-shaped abrasion was caused by "either [appellant's] brace or one of similar configuration and manufacture."

On June 5, 1997, a grand jury indicted appellant for one count of first-degree premeditated murder in violation of Minn. Stat. § 609.185(1) (1998) and one count of second-degree murder in violation of Minn. Stat. § 609.19, subd. 1(1) (1998). Appellant's jury trial began in January 1998.

*Evidence Linking Appellant to March 17, 1996 Brick Throwing Incident*

At trial, the state's theory of the case was that appellant had killed Ms. Bauer and had attempted to frame Tran for the crime. In support of this theory, the state presented evidence that appellant, not Tran, threw the brick through Ms. Bauer's window on March 17, 1996. A handwriting expert from the BCA testified that while appellant could not be identified or excluded as the author of the note attached to the brick, it was "probable" that Tran did not write the note. The state also introduced two pieces of brick seized from the entryway outside of appellant's workplace that "fit together like a puzzle piece" with the piece of brick thrown through Ms. Bauer's window.

State witnesses testified that as part of his job with the security staff at the school administration building in Saint Paul, appellant listened to a police scanner and was known to monitor calls dispatching emergency personnel to Ms. Bauer's house. Appellant was working on March 17 at the time police were dispatched to Ms. Bauer's house in connection with Tran's threatening phone calls. According to his work schedule for March 17, appellant got off work at 11:30 p.m., approximately 15 minutes before the brick was thrown through Ms. Bauer's window. Witnesses testified that it took from 10 to slightly over 15 minutes to drive from the school administration building to Ms. Bauer's house.

*Physical Evidence Linking Appellant to Ms. Bauer's Killing*

To connect appellant to the killing itself, the state offered the testimony of the police investigators, BCA analysts, and Dr. McGee who testified about the results of their investigations. During direct examination, the state asked Dr. McGee whether, in his opinion, "the person who assaulted Mrs. Bauer intended merely to assault her or to kill her?" Without any objection from defense counsel, Dr. McGee answered, "I believe to kill her." The state then finished its examination of Dr. McGee without any objection from the defense. Only when testimony resumed after a three-day holiday weekend did defense counsel move the trial court to instruct the jury to disregard Dr. McGee's opinion concerning the intent of Ms. Bauer's assailant. The court denied the motion, ruling that the defense had waived its objection and that the testimony was harmless.

The state also offered the testimony of Daniel Davis, M.D., a forensic pathologist employed as an Assistant Hennepin County Medical Examiner. Dr. Davis is also the owner and chief executive officer of Expert Digital Solutions, Inc., a private business which creates computer assisted graphics for trial use. Like Dr. McGee, Dr. Davis had compared the hinges on appellant's right leg braces to the autopsy photograph of the L-shaped abrasion on Ms. Bauer's left calf. Dr. Davis testified that comparisons of injuries on a deceased person to instrumentalities that may have caused those injuries were "a routine part of what a medical examiner does" and that scaled photographs of the injuries are "frequently" taken for this purpose. Dr. Davis testified that from his comparison of the leg brace to the autopsy photograph, he felt "quite strongly that there was a similarity between the mechanism of the brace" and the L-shaped abrasion.

In connection with Dr. Davis' testimony, the state sought to introduce a computer-generated 26 inch by 36 inch "poster" made by Dr. Davis that showed a scaled

comparison of the hinge on appellant's leg brace and the L-shaped abrasion on Ms. Bauer's calf. At a pretrial hearing, the defense objected to the use or admission of this poster, claiming that the state had failed to lay sufficient foundation to establish the poster's credibility and validity.

At both the pre-trial hearing and at trial, Dr. Davis testified that he created the poster by scanning into his computer Dr. McGee's scaled autopsy photograph of the L-shaped abrasion and a similarly scaled photograph Dr. Davis had taken of the brace hinge. After scanning the images into his computer, Dr. Davis used Adobe Photoshop software, a desktop image-editing program, to digitally combine the two images. Dr. Davis first placed the image of the hinge directly over the image of the abrasion resulting in "an exact overlay comparison." Dr. Davis then edited the resulting image by removing all portions of the brace other than the hinge. He also added rulers to the image to ensure that the scale of the image was accurate and placed lines on the image to indicate depth. Dr. Davis testified that he did not otherwise alter the original images.

The state initially sought to introduce Dr. Davis' poster as substantive evidence that the hinge on appellant's leg brace was the cause of the L-shaped abrasion on Ms. Bauer's calf. After a pretrial hearing and subsequent memoranda on the issue, the district court ruled that the poster was admissible as substantive evidence.

During Dr. Davis' testimony, the poster was shown to the jury and was extensively referred to by Dr. Davis in direct and cross-examination without objection. At the outset of his testimony, Dr. Davis testified that the purpose of the poster was to help people in the courtroom environment better understand the independent comparison of the leg brace and autopsy photograph he had made in Dr. McGee's office. On cross-examination, Dr. Davis testified that:

> [t]he poster itself is not the analysis. The poster is a demonstration of what I'm providing as my analysis of the photograph from the original three-dimensional object. The poster is intended to give others an idea using my explanation of the similarities I am referring to.

Defense counsel extensively cross-examined Dr. Davis about the poster. Dr. Davis repeated in great detail the procedure he had used to create the poster. He reiterated that the poster was not a photograph of the brace hinge on the L-shaped abrasion, but was a computer-generated graphic that he had created by scanning two separate photographs into his computer and then digitally editing them using the Adobe Photoshop software. He again explained the specific changes he had made in the original photographic images.

On redirect examination, the state offered the poster into evidence. No ruling on the poster was made at that time. However, in a subsequent hearing outside the presence of the jury, the trial court declined to receive the poster as substantive evidence. Citing Dr. Davis' testimony, the court ruled that the poster had been used only for illustrative purposes and therefore would not be allowed into the jury room during deliberations. The defense did not ask for a jury instruction on the illustrative nature of the poster, and no such instruction was given.

*Evidence Contradicting Appellant's Alibi*

The state also offered evidence contradicting appellant's alibi for the night Ms. Bauer was killed. Although appellant said he was last at Ms. Bauer's house at approximately 2:30 p.m. on March 19, one of Ms. Bauer's neighbors testified seeing appellant outside of Ms. Bauer's house apparently "casing" the house at approximately 5:00 p.m. that evening. Two employees of the bar where appellant said he had spent the evening of March 19 testified that they did not see anyone fitting appellant's description in the bar that evening.

*Evidence of Appellant's and Ms. Bauer's Relationship*

Over the defense's objections, the trial court admitted evidence concerning the past relationship between appellant and Ms. Bauer. Witnesses testified that Ms. Bauer and appellant had frequent financial difficulties throughout their marriage. The state introduced evidence that appellant was the beneficiary of a life insurance policy on Ms. Bauer issued by appellant's employer. Witnesses testified about two instances of appellant's alleged physical abuse of his children and testified that appellant routinely subjected Ms. Bauer to verbal and emotional abuse. Several witnesses also testified that Ms. Bauer was afraid of appellant. The jury also heard that appellant had attempted suicide in December 1995, when he and Ms. Bauer were going through an especially difficult period in their relationship.

In addition to the above evidence, the state introduced testimony regarding two death threats appellant had made against Ms. Bauer in the months preceding her death. With respect to the first death threat, Ms. Bauer's brother and Kathleen Kirk, a friend of Ms. Bauer's, testified that, on separate occasions, Ms. Bauer told them that appellant had threatened to shoot her in late November or early December 1995. With respect to the second death threat, a co-worker of appellants testified that, approximately two months before Ms. Bauer's killing, appellant became infuriated upon learning that he may be ordered to pay child support. According to the co-worker, appellant "said he was going to kill [Ms. Bauer] and he would never pay child support." In March 1996, appellant began receiving checks indicating that a certain amount of his wages was being garnished to pay his child support obligations.

*Defense Case*

The defense offered the testimony of two experts. First, the defense called a DNA expert who criticized the BCA's DNA testing protocol and disputed the

BCA's conclusions. The defense also offered the testimony of Dr. John Plunkett, a forensic pathologist. Dr. Plunkett had conducted a 10-minute physical examination of appellant in which he manipulated appellant's legs and tested the reflexes in appellant's lower extremities. In addition, Dr. Plunkett had reviewed the state's evidence and appellant's medical records from an earlier psychological examination. From this, Dr. Plunkett testified that, without his leg braces, appellant was effectively paralyzed in his right leg and that appellant could not lift his right leg off the floor or flex his right leg against gravity. Dr. Plunkett then testified that for the brace to inflict the L-shaped abrasion on Ms. Bauer's calf, the wearer's leg would have had to have been flexed into a 90-degree angle. Dr. Plunkett further testified that the hinge on appellant's leg brace was not the only object that could have caused the L-shaped abrasion on Ms. Bauer's calf and that the injury could have been caused by the hinges from the sofa bed on which Ms. Bauer's body was found.

The defense also offered evidence to contradict the state's theory of the March 17 brick-throwing incident. To dispute the state's evidence that Tran was at work when the brick was thrown, the defense counsel called a record custodian from Tran's workplace. Although the custodian could offer no testimony as to Tran's whereabouts on March 17, 1996, the custodian did testify that in May of 1996 he discovered that the photograph on Tran's electronic access card had been altered. Based on this evidence, the defense counsel suggested that someone other than Tran might have used the card at Tran's workplace on March 17, thus accounting for the computer records relied on by the state to show that Tran was at work.

As for appellant's whereabouts during the March 17 brick-throwing incident, the defense called one of appellant's co-workers who testified that Mr. Bauer was still at work when the brick was thrown. The co-worker testified that at approximately

11:30 p.m. on March 17, 1996, he heard a call on the school administration building's police scanner, dispatching officers to Ms. Bauer's house to investigate the brick-throwing incident. The co-worker further testified that, at that time, appellant had just gotten off work and was in the process of exiting the school administration building. On cross-examination, however, it was pointed out that the co-worker's testimony conflicted with the times indicated on the 911 records of the brick-throwing incident.

On January 31, 1998, the jury found appellant guilty of both counts. Appellant was formally convicted of the first-degree murder charge and sentenced to life in prison.

## I.

■ "[E]videntiary * * * rulings generally rest within the trial court's discretion and will not be reversed absent a clear abuse of discretion." *State v. Glaze*, 452 N.W.2d 655, 660 (1990). Appellant alleges that the trial court's rulings with respect to several pieces of evidence, either alone or cumulatively, prejudiced his defense and therefore warrant reversal of his conviction.

### A. Dr. Davis' Computer Created Poster

Appellant argues that the trial court erred in allowing Dr. Davis to display the poster of the brace hinge superimposed over the L-shaped abrasion on Ms. Bauer's leg. Specifically, appellant asserts that the state failed to establish the scientific reliability of the software used to create the poster as required by such cases as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923).

Appellant's reliance on *Frye* and *Daubert* is misplaced. Both cases concern the foundational requirements for admitting an expert's testing procedures and results as substantive evidence. *See Daubert*, 509 U.S. at 582, 113 S.Ct. 2786; *Frye*, 293 F.

at 1014. In the present case, Dr. Davis' poster was not admitted as substantive evidence that appellant's brace caused the abrasion on Ms. Bauer's leg. Rather, the poster was used only as illustrative evidence to assist Dr. Davis in explaining his independent comparison of the actual brace hinge to the autopsy photograph of the L-shaped abrasion.

■ Our longstanding rule governing the admissibility of illustrative evidence is that such evidence is "admitted, when properly verified, to illustrate or express the testimony of a competent witness, but [is] not original evidence." *Strasser v. Stabeck*, 112 Minn. 90, 92, 127 N.W. 384, 385 (1910). Verification and authentication of such evidence may be made by having a knowledgeable witness testify that the exhibit is a substantially correct representation of what that witness independently observed. *See State v. Lawlor*, 28 Minn. 216, 218, 9 N.W. 698, 699 (1881); Minn. R. Evid. 901(b)(1); Charles T. McCormick, *McCormick on Evidence* § 213 (John W. Strong, ed., 4th ed.1992).

■ In the present case, Dr. Davis actually placed appellant's brace on the autopsy photograph. Both he and Dr. McGee testified that such comparisons are a common practice among medical examiners seeking to determine the cause of an injury. In subsequently creating the poster, Dr. Davis used rulers and scales to ensure that size and proportion were depicted accurately. Thus, Dr. Davis was able to, and did, verify, from first-hand knowledge, that the image depicted on the poster was a substantially accurate representation of the important elements of his independent comparison of the brace hinge and the autopsy photograph. Accordingly, we hold that Dr. Davis, a competent and knowledgeable witness, laid the proper foundation to use the poster to illustrate his testimony concerning that independent comparison. Because the trial court did not receive the poster as substantive evidence of a scientific or medical fact, we

need not decide whether the proper foundation was laid to admit the poster for such purposes.

■ Appellant also argues that the poster should have been excluded under Minn. R. Evid. 403 because its probative value was substantially outweighed by the danger of unfair prejudice. Specifically, appellant argues that the jury may have been misled into believing that the poster was actually a photograph of the brace hinge placed on Ms. Bauer's leg. We acknowledge that the trial court could have helped clarify the issue by instructing the jury on the illustrative nature of the poster. However, on direct examination, Dr. Davis testified at length as to how the poster was created and what it depicted. Moreover, with extensive cross-examination and in its closing arguments, the defense had ample opportunity to, and did, point out the relative weaknesses of the image depicted on the poster. Finally, any danger that the poster would be used in a context other than to illustrate Dr. Davis' testimony was largely alleviated by the trial court's ruling excluding the poster from the jury deliberation room. Therefore, we hold that the probative value of the poster was not outweighed by the danger of unfair prejudice.

*B. Dr. McGee's Testimony Regarding the Intent of Ms. Bauer's Assailant*

■ Appellant's second claim of error concerns Dr. McGee's testimony that he believed Ms. Bauer's assailant intended to kill her rather than merely assault her. Appellant contends that it was prejudicial error to admit such testimony. The defense, however, failed to make a timely objection to this testimony. "Generally, failure to object to evidence * * * constitutes waiver of those issues on appeal" unless appellant shows that admission of the evidence was plain error. *Van Buren v. State*, 556 N.W.2d 548, 551 (Minn.1996). To establish plain error, appellant must show that the ruling (1) was error, (2) was plain, and (3) affected appellant's substan-

tial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998).

With respect to the first two factors, the state argues that this issue is controlled by *State v. Bowers*, 482 N.W.2d 774 (Minn. 1992), where we held that there was no error in permitting a medical examiner to testify that the depth of a stab wound indicated that the stabbing was an "intentional" act. *Id.* at 778. In so holding, we recognized that the medical examiner "was only stating the obvious." *Id.* Likewise, in *State v. Parker*, 585 N.W.2d 398 (Minn. 1998), we held that a medical examiner's conclusion that a stabbing was deliberate and not accidental is "proper when based on the physical nature of an injury." *Id.* at 406.

Contrary to the state's assertions, however, resolution of this issue is governed by our decision in *State v. Chambers*, 507 N.W.2d 237 (Minn.1993). There, we held that it was error to allow a "pathologist to give an expert opinion that the killing was intentional," reasoning that the determination of the requisite *mens rea* should be left to the jury. *Id.* at 239. Like Dr. McGee in the present case, the pathologist in *Chambers* gave an opinion as to whether the assailant intended the result of his acts—i.e., the victim's death. In contrast, the experts in *Bowers* and *Parker* testified as to whether the acts themselves—i.e., the stabbings—were intentionally as opposed to accidentally inflicted. *Chambers* acknowledges this distinction:

> A pathologist may appropriately testify to things such as the number and extent of the wounds, the amount of bleeding, * * * *whether the wounds could or could not have been the result of accident,* the cause of death, and so forth, *but the pathologist should not be allowed to make an "expert inference" of intent to kill from these matters.*

507 N.W.2d at 239 (emphasis added). Here, because Dr. McGee testified as to the assailant's intent to kill, *Chambers* controls and the admission of the testimony was error.

However, even if admission of the evidence was error, to satisfy the third prong of the plain error analysis, the appellant has the "heavy burden" of showing that "the error was prejudicial and affected the outcome of the case." *Griller*, 583 N.W.2d at 741. With respect to whether appellant has satisfied this third prong, *Chambers* is again instructive. There, we held that admission of the pathologist's opinion, although error, was not prejudicial. *Chambers*, 507 N.W.2d at 239. In so holding, we noted that "[t]he main argument of the defense was not that the killing was unintentional." *Id.* at 238. We then reasoned, "[g]iven the number and nature of the wounds, the jury readily could have found that whoever inflicted the wounds did so with an intent to kill. Thus, we do not think the admission of the pathologist's opinion testimony prejudiced defendant, particularly given the nature of defendant's defense." *Id.*

Like the appellant in *Chambers*, appellant in the present case did not assert that Ms. Bauer's killing was unintentional. Rather, his defense consisted entirely of asserting that someone else killed Ms. Bauer. Moreover, as in *Chambers*, the method of Ms. Bauer's killing—strangulation by two ligatures wrapped tightly around her neck and then secured—provided a separate basis from which a jury could readily conclude that the assailant inflicted the wounds with an intent to kill. Accordingly, we hold that although admission of Dr. McGee's testimony that Ms. Bauer's assailant intended to kill her was error, it did not substantially affect appellant's rights and thus was not prejudicial.

## C. Evidence of Appellant's and Ms. Bauer's Relationship

Appellant also asserts that admission of evidence concerning his past relationship with Ms. Bauer violated Minn. R. Evid. 404(b). Rule 404(b) prohibits the admission of "[e]vidence of another crime, wrong, or act * * * to prove the character of a person in order to show action in conformity therewith," but permits the introduction of such evidence to show motive, intent and plan, among other things.

Consistent with Rule 404(b), it is within the trial court's discretion to admit evidence of a defendant's prior acts "for the purpose of illuminating the relationship of defendant and complainant and placing the incident with which defendant was charged in proper context." *State v. Volstad*, 287 N.W.2d 660, 662 (Minn.1980). "Character evidence which tends to show the 'strained relationship' between the accused and the victim is relevant to establishing motive and intent and is therefore admissible." *State v. Mills*, 562 N.W.2d 276, 285 (Minn.1997) (citing *State v. Flores*, 418 N.W.2d 150, 159 (Minn.1988)). Prior to admitting such evidence, "the trial court must determine that there is clear and convincing evidence that the defendant committed the prior bad act and that the probative value of the evidence outweighs any potential for unfair prejudice." *State v. Buggs*, 581 N.W.2d 329, 336 (Minn.1998).

In the present case, all of the evidence to which appellant objects served to illuminate Ms. Bauer's and appellant's relationship, showing that it was strained. The evidence also served to place the incident for which appellant was charged into proper context. Accordingly, the trial court acted within its discretion in determining that the evidence was relevant.

With respect to the disputed evidence's potential for unfair prejudice, we first recognize that some of the evidence, including the insurance policy on Ms. Bauer's life, the couple's past financial troubles, and appellant's suicide attempt, did not tend to show that appellant was guilty of any past crimes. As we recently recognized in *State v. Chambers*, 589 N.W.2d 466 (Minn.1999), "[w]here evidence sought to be introduced * * * does not tend to show that the defendant is guilty of a crime other than the crime with which he is charged, 'the chance of it creating unfair prejudice [is] less than is ordinarily the

case when evidence is admitted under Rule 404(b).'" *Id.* at 477 (quoting *State v. Kutchara*, 350 N.W.2d 924, 926 (Minn.1984)). Thus, in the present case, the trial court did not abuse its discretion in admitting this evidence.

We recognize that some of the relationship evidence introduced by the state did concern prior acts by appellant that, if true, would tend to show that appellant committed past crimes. This included evidence that appellant had previously threatened and abused Ms. Bauer and their children. Where relevant to show a strained relationship, however, evidence of past abuse of or threats against the victim or her family by the defendant has generally been deemed admissible against 404(b) challenges. *See, e.g., Buggs,* 581 N.W.2d at 336–37; *State v. Thieman,* 439 N.W.2d 1, 6 (Minn.1989); *State v. Flores,* 418 N.W.2d 150, 159 (Minn.1988), *cert. denied,* 498 U.S. 945, 111 S.Ct. 359, 112 L.Ed.2d 322 (1990); *State v. Langley,* 354 N.W.2d 389, 397 (1984). Appellant has not pointed to anything so inherently prejudicial about the relationship evidence admitted in this case to distinguish it from our cases affirming the admission of such evidence.

While we conclude that the disputed evidence was otherwise admissible as tending to show a strained relationship between appellant and Ms. Bauer, under the facts of this case, we believe that two issues concerning the admission of the evidence require further discussion.

### 1. The Trial Court's Failure to Give Limiting Instructions

■ Appellant points out that the trial court did not provide any limiting instructions to the jury regarding the use of the relationship evidence. As a general rule, even absent a request by the defense, such instructions[1] should be given prior to the admission of 404(b) evidence and again at the end of trial to help ensure that the jury does not use the evidence for an improper purpose. *State v. Frisinger,* 484 N.W.2d 27, 31 (Minn.1992); *see also Buggs,* 581 N.W.2d at 337. However, where such instructions are not requested, the court's failure to give them is not grounds for reversal absent a showing of plain error. *See Frisinger,* 484 N.W.2d at 31.

■ In the present case, the defense made no requests for any cautionary instructions prior to the admission of the relationship evidence. At the end of trial, the defense did include a standard 404(b) instruction in its list of proposed jury instructions. However, at a hearing on those instructions, the trial court indicated that it was "provisionally" declining to give the 404(b) instruction. The court then asked the defense if it had any objection to the court's proposed list of instructions. Defense counsel replied, "I can't find fault with it judge, at this point." Thus, the defense waived any objection to the lack of a limiting instruction.

Under the facts of this case, the failure to give a limiting instruction absent a request was not plain error. Importantly, at no time did the state suggest that the relationship evidence be used for an improper purpose. *See Frisinger,* 484 N.W.2d at 31. Rather, in its closing argument, the state prefaced its summary of

---

**1.** The standard instruction given in connection with 404(b) evidence is set forth in 10 Minnesota Dist. Judges Ass'n, *Minnesota Practice,* CRIMJIG 3.16 (3d ed.1990), which provides:

The State introduced evidence in this case of an occurrence on _____ at _____. As I told you at the time that this evidence was offered, it was admitted for the limited purpose of assisting you in determining whether defendant committed the crime(s) with which the defendant is charged in the (indictment) (complaint) I read to you.

Defendant is not being tried for and may not be convicted of any crime other than the crime charged in the (indictment) (complaint). You are instructed specifically that you are not to convict defendant solely on the basis of any occurrence on _____ at _____. To do so might result in unjust, double punishment.

the relationship evidence by pointing out that the evidence was relevant to show motive, a permissible use. Moreover, the jury was presented with evidence that tended to mitigate the potential prejudice of the 404(b) evidence. The jury heard testimony that appellant and Ms. Bauer had been together 12 years and that despite the order for protection, Ms. Bauer willingly continued to have frequent contact with appellant. The jury also heard of several instances where appellant expressed concern for Ms. Bauer and showed love and affection for his children. In addition, the jury heard testimony concerning several instances of Tran's past violence, including his threats to kill Ms. Bauer. In light of such mitigating evidence, the danger that the evidence of appellant's relationship with Ms. Bauer would be taken out of context or be given disproportionate weight by the jury was minimal. Accordingly, the court's failure to give a limiting instruction as to the proper use of the relationship evidence was not plain error.

### 2. Hearsay Testimony Regarding Statements by Ms. Bauer

Several witnesses testified about statements allegedly made by Ms. Bauer concerning her relationship with appellant. Ms. Bauer's brother and her friend, Kathleen Kirk, testified that Ms. Bauer told them of an incident in late November or early December 1995 in which appellant threatened to shoot Ms. Bauer. Several other witnesses testified that on different occasions Ms. Bauer said she was or appeared to be afraid of appellant.

 testimony concerning Ms. Bauer's statements was hearsay—out of court statements offered to prove the truth of the matter asserted. *See* Minn. R. Evid. 801(c). Generally, hearsay is inadmissible because of its inherent lack of verification and reliability and the inability to cross-examine the declarant. *See* Minn. R. Evid. 802; *see also State v. Scott*, 501 N.W.2d 608, 616–17 (citing *Idaho v.*

*Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990)). There are, however, numerous exceptions to the hearsay 

[19] Under Minn. R. 803(2), an "excited utterance," although hearsay, is admissible if it "relat[es] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The rationale for this exception "stems from the belief that the excitement caused by the event eliminates the possibility of conscious fabrication, and insures the trustworthiness of the statement." *State v. Daniels*, 380 N.W.2d 777, 782 

[20] The testimony of Ms. Bauer's brother concerning the 1995 threat falls within the "excited utterance" exception. Ms. Bauer's brother testified that Ms. Bauer called him late one night, "very upset," "extremely agitated," and "very afraid," and asked him to come to her house to take away a pistol belonging to appellant because appellant had threatened to shoot her. This threat obviously qualifies as a startling event. Moreover, Ms. Bauer's brother's description of her condition—extremely agitated, upset, and afraid—indicates that at the time she made the statement, Ms. Bauer was still under the stress caused by the threat. Accordingly, we hold that this statement, although hearsay, fell within the "excited utterance" exception to the hearsay and was therefore admissible.

[21] The admission of Kirk's testimony, however, is more problematic. According to Kirk, a crying and hysterical Ms. Bauer told her of the threat while in the process of filing for an order for protection in late December 1995 or early January 1996. Unlike Ms. Bauer's statements to her brother, Ms. Bauer's statements to Kirk occurred days or weeks after the threat was made. Although there are no strict temporal guidelines for admitting an excited utterance, "[a]s the time lapse between the startling event and subsequent statement increases so does

the possibility for reflection and conscious fabrication." *Id.* at 782. Here, because Ms. Bauer made the statements to Kirk while seeking an order for protection well after the threat occurred, she had time to reflect upon appellant's threat. Accordingly, Ms. Bauer's statements to Kirk do not fit within the excited utterance exception.

The state, however, argues that Kirk's testimony, as well as the testimony from several other witnesses concerning Ms. Bauer's fear of appellant, was admissible as evidence of Ms. Bauer's then existing state of mind. Minnesota Rule of Evidence 803(3) excepts statements offered to show a declarant's then existing mental, emotional, or physical condition from the hearsay rule. The state argues that Kirk's testimony, and any hearsay statements concerning Ms. Bauer's fear of appellant, fall within this "state of mind" exception.

■■■■■ Even if not violative of the hearsay rule, however, state of mind evidence is subject to exclusion if its relevance is substantially outweighed by the danger of unfair prejudice. *See* Minn. R. Evid. 403. A homicide victim's state of mind regarding the defendant "is generally relevant only where the defendant raises the defense of accident, suicide, or self-defense." *State v. Blanchard,* 315 N.W.2d 427, 432 (Minn.1982). Accordingly, for such evidence to be admissible: (1) the victim's state of mind must be relevant, as when the defendant raises the defenses of accident, suicide, or self defense; (2) the probative value of the evidence must not be outweighed by its risk for unfair prejudice; and (3) a proper limiting instruction must be given to the jury. *Id.* at 432. "These conditions are necessary because of 'the risk that the jury will consider the victim's statements of fear as a true indication of a defendant's intentions or actions.'" *Id.* (quoting *Campbell v. United States,* 391 A.2d 283, 287 (D.C.App.1978)).

Here, because appellant did not allege that an accident, suicide, or self-defense caused Ms. Bauer's death, Ms. Bauer's state of mind was not relevant to appellant's guilt. Moreover, the court gave no limiting instructions prior to admitting the state of mind evidence. Thus, admission of this evidence was error.

■■■■■ A determination that the admission of the state of mind evidence was error, however, does not end our analysis. When the admission of objected to evidence, although error, is harmless beyond a reasonable doubt, reversal is not required. *See State v. Shannon,* 583 N.W.2d 579, 585 (Minn.1998); *Blanchard,* 315 N.W.2d at 432. An error is harmless, and reversal not required, "[i]f the verdict actually rendered was surely unattributable to the error." *State v. Jones,* 556 N.W.2d 903, 910 (Minn.1996).

In the present case, when viewed in the context of all the evidence, the state of mind evidence was insignificant and cumulative. The presence of Ms. Bauer's DNA on appellant's underwear and the testimony of Dr. McGee and Dr. Davis concerning the cause of the L-shaped abrasion on Ms. Bauer's leg provided strong, if not overwhelming, evidence of appellant's guilt. While it should not have been admitted, Kirk's testimony concerning the 1995 threat merely repeated an event Ms. Bauer's brother had already testified about. Any prejudicial potential of Kirk's testimony was further reduced by the testimony of appellant's co-worker about the second death threat appellant made against Ms. Bauer in early 1996. In addition to this properly admitted evidence of appellant's death threats, the jury also heard that Ms. Bauer had filed for and was granted an order for protection against appellant and that appellant abused Ms. Bauer and their children. In light of such evidence, the fact that Ms. Bauer feared appellant was obvious and the testimony concerning that fact cumulative. Under these facts, admission of evidence of Ms. Bauer's state of mind, although error, was harmless.

### D. The Trial Court's Exclusion of Defense Evidence

 The erroneous exclusion of evidence is grounds for reversal unless "the reviewing court [is] satisfied beyond a reasonable doubt that if the [excluded] evidence had been admitted and the damaging potential of the evidence fully realized, an average jury (i.e., a reasonable jury), would have reached the same verdict." *State v. Post,* 512 N.W.2d 99, 102 (Minn. 1994) (footnote omitted). Appellant asserts that the trial court's exclusion of two pieces of defense evidence was prejudicial error.

#### 1. Recordings of Appellant's Police Interviews

At trial, the state introduced several incriminating statements by appellant through the testimony of police officers who had interviewed appellant during the course of their investigation. Minnesota Rule of Evidence 801(d)(2) permits the admission of statements by a party opponent when offered against that party opponent. While testifying, the officers referred to, and at times read from, transcripts of appellant's interviews.

The defense made a motion to introduce the full recordings of appellant's interviews. In opposition to that motion, the state argued that the defense could not introduce the full recordings because the statements therein were self-serving hearsay with respect to appellant, and, in any event, the full recordings were unnecessarily repetitive and time consuming. The trial court denied defense's motion. On appeal, appellant contends that the exclusion of the full recordings was prejudicial error because the recordings were the "best evidence" of his statements. *See* Minn. R. Evid. 1002.

 Despite appellant's assertions, a witness with first-hand knowledge of what was said in a conversation may permissibly testify as to what he heard. *See* Minn. R. Evid. 602. In so testifying, a witness may legitimately rely on a writing to refresh his or her memory. Minn. R. Evid. 612. "A trial court has wide discretion in permitting use of memoranda [to refresh a witness's memory] and in the references that may be made thereto." *Ostrowski v. Mockridge,* 242 Minn. 265, 274, 65 N.W.2d 185, 191 (1954). At trial, appellant did not raise any objection to the officers' ability to remember what was said during the recorded interviews. Defense counsel had access to the interview recordings and transcripts thereof and the trial court permitted defense counsel to cross-examine the officers about any of the statements they made concerning the interviews. On appeal, appellant has not pointed to any inaccuracies in the officers' testimony or provided evidence that the testimony was in any way misleading. Accordingly, we find no error with the manner in which appellant's statements were received.

 also asserts that Minn. R. Evid. 106 required the trial court to admit the recordings of the interviews into evidence. This rule provides, "when a * * * recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part * * * which ought in fairness to be considered." Minn. R. Evid. 106. In *Mills,* however, we recognized that Minn. R. Evid. 106 is not applicable unless portions of the actual recording have been introduced into evidence. *Id.* at 286 n. 8, 65 N.W.2d 185; *see also State v. Taylor,* 258 N.W.2d 615, 622 (Minn.1977). Here, the state did not introduce any part of the actual recordings into evidence. In *Mills,* we also recognized that "the 'rule of completeness' applies only when it is necessary to give the jury a full understanding of the facts and it may not be used to introduce otherwise irrelevant statements." 562 N.W.2d at 286–87. We thus held that a trial court may properly exclude self-serving portions of a recorded interview of a criminal defendant, even though it had allowed police to testify as to certain admissions the defendant made in

that interview. *Id.* at 286. Likewise, in the present case, we hold that Rule 106 did not require the trial court to admit the entire recordings of appellant's interviews.

### 2. Limiting Dr. Plunkett's Testimony

Appellant also asserts that it was prejudicial error for the trial court to limit Dr. Plunkett's testimony by refusing to admit certain photographs into evidence and by prohibiting Dr. Plunkett from testifying as to certain aspects of appellant's physical abilities.

▇ On redirect examination of Dr. Plunkett, the defense sought to introduce several photographs of sofa bed hinges in an attempt to show that the L-shaped abrasion on Ms. Bauer's left calf was caused by the hinges from the sofa bed on which she was found rather than by the hinge on appellant's leg brace. The disputed photographs, however, did not depict the hinges from Ms. Bauer's sofa bed and the defense made no offer of proof that the hinges in the photographs were the same type as or even similar to those hinges. Thus, the defense failed to establish that the disputed photographs were relevant. Moreover, in testifying about the cause of the L-shaped abrasion, Dr. Plunkett did refer to photographs of the actual hinges from Ms. Bauer's sofa bed, and those photographs were admitted into evidence. Therefore, the exclusion of the disputed photographs had at most a minimal impact on Dr. Plunkett's testimony and did not prevent him from testifying that the hinges from Ms. Bauer's sofa bed could have caused the L-shaped abrasion. Accordingly, we hold that the court did not err in excluding the disputed photographs.

▇ The trial court also limited the scope of Dr. Plunkett's testimony regarding appellant's physical abilities. Appellant claims these limits prevented Plunkett from testifying that appellant was physically incapable of killing Ms. Bauer in the manner alleged by the state. A trial court has wide discretion in determining the suf-

ficiency of the foundation for admitting opinion testimony. *Holweger v. Great Northern Ry.,* 269 Minn. 83, 95, 130 N.W.2d 354, 362 (1964). In the present case, Dr. Plunkett's knowledge of appellant's physical abilities was gained from a 10–minute examination of appellant's lower extremities and from reviewing medical records of a cursory physical examination of appellant. At trial, the defense conceded that Dr. Plunkett's area of expertise was pathology and that he had no special expertise in the areas of physical or occupational therapy. In light of this foundation, the court limited Dr. Plunkett's testimony as follows:

> He can testify about whether or not Mr. Bauer can move his lower extremities in whatever manner he thinks is appropriate. I'm not going to let him testify about any general comments about Mr. Bauer's agility, upper body strength or any of that kind of stuff * * *.

The court then clarified that Dr. Plunkett could testify about anything he observed during his examination of appellant and as to any conclusions he reached as a forensic pathologist. Under these restrictions, Dr. Plunkett still testified as to appellant's inability to move his right leg in the manner necessary to inflict the L-shaped abrasion. Because the limits on Dr. Plunkett's testimony corresponded to the limits of his expertise and did not prejudice appellant, we hold that the trial court did not abuse its discretion in imposing the limits. *See id.*

### II.

▇ Appellant also asserts that the evidence presented at trial was insufficient to support the jury's verdict. "A challenge to the sufficiency of the evidence requires 'a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did.'" *State v. Church,* 577 N.W.2d 715, 719 (Minn.1998) (quoting *State v. Webb,* 440 N.W.2d 426, 430 (1989)). "The conviction

may only stand where the circumstances form 'a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt.'" *State v. Bias,* 419 N.W.2d 480, 484 (Minn.1988) (quoting *State v. Wahlberg,* 296 N.W.2d 408, 411 (Minn.1980)). In reviewing the evidence we must "assume the jury believed the prosecution's witnesses and disbelieved any contrary evidence." *State v. Ashby,* 567 N.W.2d 21, 27 (1997).

For a jury to find a defendant guilty of first-degree premeditated murder, the state must show that the defendant "cause[d] the death of a human being with premeditation and with intent." Minn. Stat. § 609.185(1). For the jury to find the defendant guilty of second-degree murder, the state must show that the defendant "cause[d] the death of a human being with intent * * * but without premeditation." Minn.Stat. § 609.19, subd. 1(1). On appeal, the only element appellant takes issue with is identity, arguing that the state's evidence failed to show that he, rather than someone else, murdered Ms. Bauer.

The state offered substantial direct and circumstantial evidence linking appellant to Ms. Bauer's killing. While it warrants stricter scrutiny, circumstantial evidence is entitled to the same weight as direct evidence. *Ashby,* 567 N.W.2d at 27. Here, Ms. Bauer's blood was found on underwear seized from appellant's residence. The state's DNA expert testified that Tran, but not appellant, could be excluded as a source of at least some of the samples of blood taken from the crime scene. Two forensic pathologists testified that the most likely cause of the L-shaped abrasion on Ms. Bauer's leg was the hinge from appellant's leg brace. The state's witnesses contradicted appellant's alibi for the night of the killing. Also, the state's witnesses testified that appellant had threatened to kill Ms. Bauer only months before her death. Moreover, the handwriting analysis and pieces of brick introduced at trial suggested that appellant, not Tran, was the author of the March 17 note. This evidence, taken in the light most favorable to the verdict and assuming that the jury believed this evidence and disbelieved the defense's evidence to the contrary, was sufficient for the jury to reach the verdict they did. Accordingly, we hold that the evidence was sufficient to support the verdict.

Affirmed.