*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0920**

State of Minnesota,
Respondent,

vs.

Ger Lee,
Appellant.

**Filed April 11, 2016
Affirmed
Rodenberg, Judge**

Ramsey County District Court
File No. 62-CR-14-7975

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Kaarin Long, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Rodenberg, Presiding Judge; Hooten, Judge; and Randall, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**UNPUBLISHED OPINION**

**RODENBERG**, Judge

On appeal from his conviction of second-degree assault, appellant Ger Lee argues that the district court's erroneous admission of relationship evidence under Minn. Stat. § 634.20 (2014) requires a new trial. In his pro se supplemental brief, appellant additionally argues that the district court erred in finding the state's witnesses credible, and he raises claims of ineffective assistance of counsel, prosecutorial misconduct, and a *Brady* violation. We affirm.

**FACTS**

Appellant and B.V. were married in April 2011 in a traditional Hmong ceremony. B.V.'s family provided child care for the son of appellant and B.V. during the day. B.V. testified at trial that appellant had physically abused her and threatened to harm her with a knife several times beginning in February 2014, but appellant had promised not to hit or threaten her again.

Appellant and B.V. argued during the evening hours of October 16, 2014. During the argument, B.V. locked herself in a bathroom after appellant threatened her with a screwdriver. Appellant tried to break into the bathroom by kicking the door.

Because of appellant's actions on October 16, B.V. decided to leave appellant. She fled to her parents' residence the following day. There, B.V. told her sister, I.V., and her parents that she was leaving appellant because of his threats and abuse. B.V.'s parents did not support her leaving appellant because of their cultural beliefs. B.V.'s father called appellant to come to the residence because B.V. refused to return to the

home she shared with appellant. Fearful that appellant would come to her parents' residence, B.V. asked I.V. to record any conversation B.V. had with appellant from another room and to call the police if B.V. yelled out I.V.'s name. B.V. also hid all of the kitchen knives at her parents' home because of appellant's history of threatening to use knives to harm her.

Appellant drove to B.V.'s parents' residence after work. He appeared very angry and did not remove his shoes as he usually did. Appellant sat in the living room and called out to B.V. After talking briefly with her sister, B.V. went into the living room and sat on a couch next to her mother, with her son on her lap, while appellant sat in a chair on the other side of the room. B.V.'s father stood in the hallway. I.V. remained in the bedroom, using her cellular phone to record the conversation between appellant and B.V. Appellant began to yell obscenities at B.V., repeatedly stating that B.V. ruined his life, had "backstab[bed]" and lied to him. B.V. can be heard on the recording made by I.V. quietly stating that she does not feel safe and repeatedly asking appellant to leave.

During this outburst, appellant went into the kitchen and returned to the living room with a claw-head hammer. B.V. testified that she yelled out I.V.'s name after appellant began rummaging through drawers in the kitchen. I.V. ended the recording, called 911, and told the dispatcher that she believed B.V. was being stabbed because she could hear B.V. being struck.

Appellant struck B.V. twice with the hammer, hitting her right ankle and knee. B.V. testified that appellant stated that he was going to "finish" her and kill her. B.V. screamed for him to stop, called out for help, and tried to shield her son from the

3

hammer. B.V.'s mother attempted to cover B.V. and her son while her father tried to pull appellant away from them. B.V.'s parents were eventually able to pull the hammer away from appellant.

St. Paul Police Officer Eric Kammerer arrived at the home and, from outside the apartment, heard yelling from within it. Based on the report of a possibly violent domestic disturbance, he and other officers proceeded through the unlocked door and announced their presence. Officer Kammerer observed B.V. lying on the couch with a bleeding wound on her right foot. When Officer Kammerer asked what had happened, B.V.'s father, who does not speak English, raised his hand and made a swinging motion with the hammer, pointed at B.V., and then pointed at appellant. B.V. told Officer Len Manning that appellant had struck her with the hammer. B.V. was taken to the hospital and treated for her injuries. Appellant was arrested.

Appellant was charged with second-degree assault. Appellant waived his jury-trial rights, and the case was tried to the district court sitting without a jury.

Over defense counsel's objection, the district court admitted relationship evidence and evidence of similar domestic abuse by appellant against B.V. At trial, B.V. testified as set forth above. Appellant testified at trial and claimed that he and B.V. had recently been getting along well, but that they had argued about B.V.'s parents providing child care. Appellant testified that he went to B.V.'s parents' residence to speak with B.V.'s father, but that the father acted strangely and it soon became apparent that he did not intend to speak with appellant. Appellant claimed that he became angry when B.V. told him that she wanted a divorce and asked him if he "wanted the easy way or the hard

4

way." He then testified that he stood up to leave and ran to the apartment door when he heard B.V. scream her sister's name. Appellant claimed that he could not open the door, so he went to the kitchen to arm himself with the hammer because B.V. owned a gun located in her parents' bedroom.

Appellant testified that B.V. and her mother "ambushed" him by grabbing onto his shirt while B.V.'s father stood in his bedroom doorway holding a large knife in his hand. Appellant testified that he was scared, told B.V. and her mother to let him go, and stepped to the side, causing B.V.'s mother to let go of him and fall onto his son. Appellant testified that he hit B.V. twice with the hammer because she refused to let go of his shirt.

The district court found appellant guilty of the charge and sentenced him to 21 months in prison. This appeal followed.

## D E C I S I O N

### *The district court properly admitted the relationship evidence.*

Appellant claims that the district court erred in admitting evidence concerning his repeated threats to use knives against B.V., his history of physically abusing her, and the incident on October 16, 2014 under Minn. Stat. § 634.20.

We review the district court's evidentiary ruling for an abuse of discretion. *State v. Matthews*, 779 N.W.2d 543, 553 (Minn. 2010).

Minn. Stat. § 634.20 provides that

> [e]vidence of domestic conduct by the accused against the victim of domestic conduct, or against other family or household members, is admissible unless the probative value

5

is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. "Domestic conduct" includes, but is not limited to, evidence of domestic abuse. . . . "Domestic abuse" and "family or household members" have the meanings given under section 518B.01, subdivision 2.

Evidence of prior domestic abuse by the accused against the alleged victim "may be offered to illuminate the history of the relationship, that is, to put the crime charged in the context of the relationship between the two." *State v. McCoy*, 682 N.W.2d 153, 159 (Minn. 2004). Relationship evidence is treated differently than other "collateral" *Spreigl* evidence partly because "[d]omestic abuse is unique in that it typically occurs in the privacy of the home, it frequently involves a pattern of activity that may escalate over time, and it is often underreported." *Id.* at 161. Therefore, the procedural requirements of Minn. R. Evid. 404(b) do not apply to relationship evidence admitted under section 634.20. *State v. Meyer*, 749 N.W.2d 844, 849 (Minn. App. 2008).

*Probative value*

Appellant argues that the evidence concerning his threats, physical abuse, and the incident on October 16, 2014 had little probative value. He first contends that the evidence was unnecessary because B.V. "provided the [district] court with a clear picture of her marriage to appellant and that she wanted to leave him." But we agree with the state that B.V. could only do so by testifying about appellant's repeated threats to use knives against her, his history of physically abusing her, and testimony concerning the incident on October 16. The relationship evidence provided a context for B.V.'s decision

to leave appellant despite appellant's testimony that they had been getting along well, her parents' disapproval of her actions, and her father's inviting appellant to the residence to talk notwithstanding B.V.'s claim that she did not feel safe with appellant. The October 16 incident was also probative because appellant testified that their argument on October 17 was a continuation of the argument on October 16. The evidence also explains why B.V. believed it was necessary to develop a safety plan involving her sister and to hide the knives at her parents' home before appellant arrived. The evidence was therefore probative for several reasons. *See State v. Bell*, 719 N.W.2d 635, 641 (Minn. 2006) (holding that the district court did not abuse its discretion by admitting evidence of two separate order-for-protection violations).

Appellant contends that, because B.V. and other witnesses testified about the assault, the evidence did not assist the court "by providing a context with[in] which it could better judge the credibility of the principals in the relationship," *McCoy*, 682 N.W.2d at 161, because the witnesses' testimony was consistent with the police report. But appellant cites no legal authority to support the notion that a factfinder may not consider relationship evidence if an alleged victim has testified consistent with her prior statements. B.V.'s credibility was critical because she was the only person, besides appellant, who could testify to both the conversation between the parties and to the assault. Although there were three other witnesses, B.V.'s parents observed the assault but did not understand the argument between appellant and B.V. because they do not speak English, while I.V. heard the conversation but did not observe the assault. Because appellant's testimony concerning the origin of their argument and the assault contradicted

7

B.V.'s testimony, the evidence provided a context that assisted the district court with determining "the credibility of the principals in the relationship." *Id.*

Appellant cites *Bell* for his argument that the evidence was not probative because the state's other evidence was sufficient to support the allegations. 719 N.W.2d at 639. But appellant misconstrues *Bell*, which expressly "decline[d] to require that [district] courts engage in a separate analysis" of the state's need for relationship evidence because the need for such evidence is "naturally considered as part of the assessment of the probative value versus prejudicial effect of the evidence." *Id.* at 639. The supreme court also concluded that "[t]here is no question . . . [that the relationship evidence is] probative of a material fact, namely, the history of [a] relationship." *Id.* at 641; *see also Meyer*, 749 N.W.2d at 849 (rejecting that appellant's challenge to the admissibility of relationship evidence "on the ground that it was not needed to strengthen the state's case"). Additionally, the supreme court has "on numerous occasions recognized the inherent [probative] value of evidence of past acts of violence committed by the same defendant against the same victim." *State v. Waino*, 611 N.W.2d 575, 579 (Minn. App. 2000) (alteration in original) (quoting *State v. Williams*, 593 N.W.2d 227, 236 (Minn. 1999)). The relationship evidence admitted by the district court was relevant and admissible.

*Unfair prejudice*

Appellant argues that any probative value of the relationship evidence was substantially outweighed by the danger of unfair prejudice because "it reflected primarily on appellant's bad character" and "allowed the [district] court to infer that if he had

8

engaged in such conduct in the past, he also must have committed the charged crime and was not acting in self-defense. . . ."

Minn. Stat. § 634.20 "specifically provides for the admission of evidence of [domestic conduct] by the accused unless it fails to meet a balancing test that considers whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice." *McCoy*, 682 N.W.2d at 159. "[U]nfair prejudice 'is not merely damaging evidence, even severely damaging evidence; rather, unfair prejudice is evidence that persuades by illegitimate means, giving one party an unfair advantage.'" *Bell*, 719 N.W.2d at 641 (quoting *State v. Schulz*, 691 N.W.2d 474, 478 (Minn. 2005)).

A similar argument was addressed and rejected by the supreme court in *State v. Bauer*, 598 N.W.2d 352, 365 (Minn. 1999) (concluding "that the disputed evidence was otherwise admissible as tending to show a strained relationship between appellant and [the victim]").

> We recognize that some of the relationship evidence introduced by the state did concern prior acts by appellant that, if true, would tend to show that appellant committed past crimes. This included evidence that appellant had previously threatened and abused [the victim]. . . . Where relevant to show a strained relationship, however, evidence of past abuse of or threats against the victim or her family by the defendant has generally been deemed admissible against . . . challenges [based on Minn. R. Evid. 404(b) (prohibiting the admission of evidence of "another crime, wrong, or act" to prove the character of a defendant "in order to show action in conformity therewith")].

*Id.* What the supreme court stated in *Bauer* is true here. *See id.* at 364-66 (analyzing the admission of relationship evidence under Minn. R. Evid. 404(b) and not under Minn.

9

Stat. § 634.20)  The evidence was properly admitted under the statute.  Additionally, the existence of other evidence supporting appellant's conviction, including the testimony of other witnesses, appellant's admission that he hit B.V. with the claw-hammer, and the audio recording of a part of the incident, decreased the risk of unfair prejudice.  *See Meyer*, 749 N.W.2d at 850 (noting that the risk of unfair prejudice due to relationship evidence was "significantly lessened" by other evidence concerning the crime).  The district court properly reasoned that the evidence was relevant.  *See McCoy,* 682 N.W.2d at 159 ("The statute is unambiguous—evidence of [domestic conduct] in domestic abuse trials is relevant and admissible unless it should be excluded for the reasons listed.").

Appellant argues that the district court's order is indicative that its "view was clouded by the evidence of appellant's prior conduct against [B.V.]" because the order begins with reference to the relationship evidence.  A district judge acting as a fact-finder is presumed to disregard extraneous material and "make decisions based solely on the merits."  *State v. Dorsey*, 701 N.W.2d 238, 247 (Minn. 2005); *see State v. Caulfield*, 722 N.W.2d 304, 315 n.8 (Minn. 2006) ("We acknowledge that evidentiary errors may be less prejudicial in a bench trial than in a jury trial."); *Irwin v. State*, 400 N.W.2d 783, 786 (Minn. App. 1987) (affirming postconviction court's determination that the prejudicial effect of *Spreigl* evidence was reduced due to the nature of a bench trial), *review denied* (Minn. Mar. 25, 1987).  The district court did not abuse its discretion in admitting the relationship evidence.

***Reversal is not required.***

Even if the district court had erred concerning the admission of relationship evidence, which we do not find, we would nonetheless affirm appellant's conviction because he has not established that he was prejudiced by the admission of that evidence. *See State v. Clark*, 738 N.W.2d 316, 347-48 (Minn. 2007). We examine the record to determine whether there is a reasonable possibility that the erroneously admitted evidence significantly affected the verdict. *Id.*

Here, even if we were to assume that the relationship evidence was admitted in error, any error was harmless because the record amply supports the district court's finding of guilt. Minnesota Statutes criminalize assault against another person with a dangerous weapon. Minn. Stat. § 609.222, subd. 1 (2014). A person commits the offense of assault through "the intentional infliction of . . . bodily harm upon another." Minn. Stat. § 609.02, subd. 10(2) (2014). "'Dangerous weapon' means any . . . device or instrumentality that, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm . . . ." *Id.*, subd. 6 (2014). "Great bodily harm" is defined as "bodily injury . . . which causes a . . . protracted loss or impairment of the function of any bodily member . . . or other serious bodily harm." *Id.*, subd. 8.

All of the witnesses, including appellant, testified that appellant struck B.V. twice with a large claw foot hammer. Appellant does not dispute the district court's finding that the hammer could cause great bodily harm or death, nor does he dispute that B.V. suffered significant injuries to her ankle as a result of being struck. Regardless of its consideration of the relationship evidence, the record amply supports the district court's

determination that appellant's testimony concerning his claim of self-defense was not credible, based on the audio recording made by I.V. and appellant's admission that B.V. was unarmed when he struck her.

***Appellant's pro se arguments lack support and merit.***

Appellant appears to raise four separate claims in his pro se supplemental brief. First, he reiterates the same argument concerning the relationship evidence addressed above. Second, appellant argues that his trial counsel was ineffective because his lawyer did not believe him, did not request appellant's cellular phone as evidence before trial, ignored "hints that [appellant] needed more time to prepare," and that a conflict arose between them. To prevail on a claim of ineffective assistance of counsel, appellant must demonstrate that "(1) . . . his counsel's representation 'fell below an objective standard of reasonableness'; and (2) 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Nissalke v. State*, 861 N.W.2d 88, 94 (Minn. 2015) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 2064, 2068 (1984)). There is no record evidence supporting appellant's claims. Despite his claim on appeal that his lawyer should have known that appellant "needed more time to prepare," appellant demanded a speedy trial. That demand required that the trial be held within 60 days of the demand. Minn. R. Crim. P. 11.09. If appellant had needed more time to prepare, he could have waived his right to a speedy trial. Appellant's other complaints concerning his trial counsel are similarly unsupported by the record.

Appellant also argues that the prosecutor committed misconduct because she asked leading questions of B.V. and did not investigate B.V.'s claim of hidden knives. But appellant objected twice to the prosecutor's questions of B.V.; the district court sustained both objections. Moreover, a review of the record shows that the questions to which appellant now objects, even if they were leading, were only a few short lines on one page of B.V.'s 20 pages of testimony. *See* Black's Law Dictionary 1023 (10th ed. 2014) (defining "leading question" as "[a] question that suggests the answer to the person being interrogated; esp., a question that may be answered by a mere 'yes' or 'no'"). Appellant has failed to identify any record support for his claims of prosecutorial misconduct in not adequately investigating, and we therefore do not consider that argument.

Finally, appellant alleges a *Brady* violation because the prosecutor did not turn over the hidden knives to the defense. *Brady v. Maryland*, 373 U.S. 220, 83 S. Ct. 1194 (1963) (providing that a state is obligated to disclose exculpatory or impeaching evidence to defendants before trial). To warrant relief under *Brady*, a petitioner must establish that (1) the evidence not disclosed was favorable to him as exculpatory or impeaching; (2) the evidence was suppressed by the prosecution; and (3) the evidence was material, resulting in prejudice to the petitioner. *Walen v. State*, 777 N.W.2d 213, 216 (Minn. 2010). The state's suppression of evidence results in prejudice if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quotation omitted). Here, *Brady* does not apply because appellant concedes that no knives were ever recovered by the state. Moreover, appellant fails to make any argument under the *Walen* factors that would warrant relief.

13

In sum, the district court acted within its discretion in admitting relationship evidence and evidence of similar domestic abuse by appellant against B.V., and appellant's pro se arguments are meritless.  We therefore affirm.

**Affirmed.**