**STATE of Minnesota, Respondent,**

**v.**

**James BROWN, Appellant.**

**No. A10–672.**

Court of Appeals of Minnesota.

April 19, 2011.

Lori Swanson, Attorney General, St. Paul, MN; and Chad M. Larson, Douglas County Attorney, Alexandria, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, G. Tony Atwal, Assistant Public Defender, St. Paul, MN, for appellant.

Considered and decided by LANSING, Presiding Judge; ROSS, Judge; and CONNOLLY, Judge.

## OPINION

ROSS, Judge.

James Brown appeals from his felony drive-by shooting convictions, arguing that the evidence was insufficient to establish the immediacy element implicit in the statute. Because sufficient evidence does not establish beyond a reasonable doubt that Brown fired a gun "having just exited from a motor vehicle," we reverse the convictions.

### FACTS

James Brown and Rufus Russel had a violent rivalry with Randell Robertson, Curtis Cousin, and Anthony Randolph. The feuding groups frequented the same parties and bars and were interested in dating the same women. Verbal and physical fights punctuated their nights out in Alexandria.

In the early morning hours of November 12, 2008, shots were fired at Robertson, Cousin, and Randolph's Kenwood Street home. No one was hurt. Police investigated and the state charged Brown with drive-by shooting of an unoccupied car and of an occupied building and felon in possession of a firearm. *See* Minn.Stat. § 609.66, subd. 1e(a), (b) (2008) (drive-by shootings); Minn.Stat. § 609.165, subd. 1b(a) (2008) (felon in possession).

Evidence at Brown's trial proved that Robertson, Cousin, and Randolph were inside drinking when Randolph noticed a car drive past the house twice. Sometime later, he heard gunshots allegedly fired toward the house. Randolph's testimony did not indicate how much later. He at first testified ambiguously, but in a manner that at least momentarily may have led jurors to believe that Brown had fired on the house from a moving car, literally in drive-by fashion. But during cross-examination, Randolph openly retreated from the impression, clarifying, "[A]ll I'm saying is after the second time, that's when I heard bullets. That's what I can tell you."

The jury also heard from Lauren Kujawa, who recounted the events of the evening leading up to and occurring immediately after the shooting. Brown, Russel, and Kujawa, who was Russel's former girlfriend, had gone to the VFW bar. After the bar closed, Russel asked Kujawa to drive him and Brown to Brown's girlfriend's house, and she agreed. Russel gave her directions and Brown eventually asked her to stop the car. Russel and Brown exited the car. They argued. Kujawa remained inside. She tried to distract herself from the argument, first closing the windows and then turning on the

radio. She also rummaged through her glove box. Russel alone got back into the car, and they talked. Russell began telling Kujawa that he missed her and still loved her. They talked about their prior relationship. They talked about Russel's new relationship. They also discussed Kujawa's recent marriage. During their discussion, Kujawa heard unidentifiable loud noises that she would later understand were gunshots. But at the time, she thought that Brown was pounding on a door or hitting garbage cans. Brown soon returned and entered the backseat. Kujawa then noticed a handgun protruding from his pants. Brown ordered her to drive away. Kujawa realized later that she had stopped her car within blocks of the Kenwood residence where the shooting took place.

A jury found Brown guilty of all charges. He appeals only his drive-by shooting convictions.

## ISSUE

Does the trial evidence support the jury's finding that Brown discharged a firearm "having just exited from a motor vehicle" within the meaning of Minnesota Statutes section 609.66, subdivision 1e?

## ANALYSIS

■ Brown argues that the evidence is insufficient to support his convictions of felony drive-by shootings. We analyze insufficient-evidence claims by determining whether a jury could reasonably find that the defendant was guilty based on the facts in the record and the legitimate inferences they present. *Bernhardt v. State,* 684 N.W.2d 465, 476–77 (Minn.2004). Brown committed a felony drive-by shooting if, "while in or having just exited from a motor vehicle, [he] recklessly discharge[d] a firearm at or toward another motor vehicle or a building." Minn.Stat. § 609.66, subd. 1e.

■ Brown contends that at most the evidence supports findings that he exited a car, got into an argument outside the car, walked one or more city blocks from the car, and then discharged a firearm before returning to the car. So he maintains that the state never proved that he had "just exited" the car before shooting under the meaning of the drive-by-shooting statute. The state introduced no direct evidence of where Brown was when he fired the shots or when the shots were fired in relation to his leaving the car. We must therefore look to circumstantial evidence. Circumstantial evidence merits the same weight as direct evidence. *State v. Bauer,* 598 N.W.2d 352, 370 (Minn.1999). But in circumstantial-evidence cases, the evidence "must form a complete chain that, in view of the evidence as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Taylor,* 650 N.W.2d 190, 206 (Minn.2002).

■ Our answer to this appeal rests entirely on whether the circumstantial evidence is sufficient to prove that Brown fired toward the residence having *"just exited"* Kujawa's car. Although the statute does not define the phrase "having just exited from a motor vehicle," in *State v. Lewis* we construed it to require proof of "the immediate action of shooting following the exiting from an automobile." 638 N.W.2d 788, 791 (Minn.App.2002), *review denied* (Minn. Apr. 16, 2002). The act of shooting need not occur *simultaneously* with the act of exiting, but the shooting must *"immediately follow"* the exit. *Id.* (emphasis added).

We have carefully reviewed the record and do not find sufficient evidence for the jury to have reasonably concluded beyond

a reasonable doubt that Brown discharged a firearm immediately after exiting Kujawa's car. The state's two accounts of Brown's actions on the morning of the shooting fail to prove the challenged element.

Lauren Kujawa described the events surrounding the incident in the following testimony:

Q: What happens next?

A: Um, we were driving, and we got to a street, and [Brown] yelled, "Stop," so I stopped on the side of the road. I don't know what street I was on for sure. I saw a white house to my right, and then [Brown] got out of the car, and [Russel] got out of the car; and they were yelling at each other, um . . .

Q: Did you hear anything that was said?

A: Alls I heard was [Russel] say, "Don't do it." And then I tried to ignore them. And I put up the windows and turned the music up.

Q: Why did you try to ignore them?

A: 'Cuz [Russel] doesn't like when I get involved with his business.

Q: What happens next?

A: [Russel] got back in the car. [Brown] didn't. And [Russel] started talking to me, and I turned towards [Russel], and we were talking; and I heard noises. I thought [Brown] was hitting a garbage can or something, or a pounding on someone's door. I don't, I don't know what the noise was, but I thought he was hitting something.

Q: Loud enough for you to hear inside the car?

A: Yeah.

Q: What's [Russel] talking to you about?

A: Um, he asked me when I got married, and he told me he missed me and loved me.

Q: Do you think there was a reason for him talking to you like that?

A: Ah, it could have been to distract me. It could have been because he was drunk. It could have been because he missed me. I can't—

. . . .

Q: What were you saying to him?

A: I told him that I was married and that he was with Tonya and it didn't matter anymore.

. . . .

Q: So after you hear these, these thumps or the sound you described as maybe somebody hitting the garbage can, what happens next?

A: Ah, [Brown] gets back in the car. Um, when he stepped down into the car, I saw a gun on his waist. And I got upset about the gun in my car because I don't appreciate things like that in my car. I—we got into a fight about it. I said, "Get rid of it." Then I got yelled at to go.

Q: How fast is this all happening?

A: Pretty quick.

. . . .

Q: Okay. At the—towards the end of the police interview you indicated that while what you now know is a shooting was going on you were in the car?

A: Yes.

Q: And you had your head down. You said at one point you were digging in the glove box, doing other things?

A: Oh, that was when they were outside yelling that I was digging in the glove box.

Q: Correct. And you had the radio on?

A: Yes.

Q: The music was very, very loud?

A: Yes.

Q: You said you were oblivious to what was going on, does that sound right?

A: Yes.

Kujawa described the location of the car as "[w]ithin a few blocks" and "around a block away" from Randolph's house.

The following direct examination and cross examination testimony constitutes Randolph's account of the shooting:

Q: [T]ell me what happened that night.

A: We just sitting around drinking.... [W]e going to sit in the living room and look from all the way around the corner like as the house was a lot of windows in it, and we just sitting in there ... looking. And we all—you know, we just being cautious. We see a car fly by. Somebody said, "Man, that looked like their car." I said, "You think so?" I said, "What's happened here?" This is about 2:00. I said, "Yes, they let, they let out."

So, um, we just looking. Here come the car again. But this time he came back shooting. And it happened so fast, the only thing we could do was just say, "Get down. Get down. Get down," you know, because we ain't know if they gonna just—we hear the shots. We didn't know how far they was going to take it.

. . . .

Q: When shots were fired though, you did not see who fired those shots, correct?

A: No, I didn't.

Q: You don't know if they came out of a car or not?

A: No, I didn't. You're right about that.

. . . .

Q: And you said here today that you came by—[the car] came flying by shooting?

A: I'm going to tell you this, this is how it is, this, I'm going to tell you this. The first time I seen the car. The second time I noticed the car, the shots came so quick I just got down. Once I heard bullets flying, I wasn't trying to think of nothing else but getting down. Now, I don't know how the car—I don't know, I don't know what kind of drivers they are. I mean all I know when I heard them bullets firing, I got down.

Q: Did you hear the car stop?

A: I mean I'm inside, I'm inside, and it's snowing, it's very cold, you know. When we saw them the first time, we knew one thing they didn't have no business flying up our street like—it's not our street, but being into it, why would they come flying up the street? Now the second time I couldn't think of nothing because here come the shots, and I got down.

Q: So your impression was is that it was shooting as it was going by?

A: However you want to say it.

Q: Well, I'm asking you, how you say it.

A: Well, I mean all I'm saying is after the second time, that's when I heard bullets. That's what I can tell you.

The preceding testimony is the only evidence the jury received bearing on the timing of the shooting. We must determine whether this evidence is sufficient to support the jury's finding that the shooting came immediately after Brown exited Kujawa's car.

The *Lewis* appeal led us to recognize some flexibility in the concept of immediacy to avoid an unreasonably constrained application of the statute. In *Lewis,* the testimony of three eyewitnesses supported the jury's finding that the defendant drove to a park, jumped out of the vehicle, ran to a basketball court, and began shooting within one to two minutes from the time

he left the vehicle. *Lewis,* 638 N.W.2d at 791. That evidence was sufficient to support the drive-by-shooting conviction, *id.* at 791–92, but *Lewis* extends "just exited" to its logical limit. The state here failed to introduce any direct evidence establishing that the amount of time between the defendant's leaving the car and his opening fire fell within that limit. And the circumstantial evidence does not show immediacy as to timing or between events. Both accounts certainly informed the jury that things happened fairly quickly, but Kujawa's testimony indicated without contradictory evidence that several events occurred between Brown's leaving the car and his return, including Brown and Russel arguing outside the vehicle, Kujawa closing her car windows, Kujawa rummaging inside the glove box, and Kujawa and Russel conversing about their former romantic relationship. It is not clear exactly when, in relation to these events, Kujawa heard the noises that turned out to be gunshots. She never testified to how much time passed, and the prosecutor never asked. Kujawa's story cannot prove immediacy.

We acknowledge that Randolph testified that he first saw a car drive by and then heard gunshots. But Randolph's vague testimony suggesting immediacy cannot constitute sufficient circumstantial evidence to prove that the time between the exiting and discharging was brief; he left out any specific facts that would allow the jury to determine timing and he then clarified that he could say only that the shooting occurred "after" he saw the car. And we are convinced that the jury did not convict Brown by speculatively filling in the gaps in Randolph's testimony because the state's argument at trial forecloses the possibility.

The state not only relied solely on Kujawa's testimony to convict Brown, it also actually agreed with Brown's attorney that Randolph's testimony is not a credible source to determine the chain of events. The state gave its closing argument without even mentioning Randolph's account of the shooting. Brown's attorney then argued to the jury that Randolph had been drunk, that he told the police nothing the night of the shooting, and that he had "absolutely no direct information whatsoever who shot up the house." He insisted that Randolph offered only "assumptions" and nothing more. The state not only left mostly undisturbed this direct attack on Randolph's credibility, it joined in; its rebuttal argument acknowledged that Randolph's testimony was largely conjecture: "And Anthony Randolph, yeah, an interesting guy, and he does, *he makes leaps.*" The state then clarified that the jury should rely on Randolph for "one thing," which is that "he heard gunshots" while Brown was in the vicinity. It never suggested that Randolph's version was otherwise accurate or that the jury had any basis from which it could infer an immediate relationship between Randolph's seeing a car and hearing the shots.

The state's argument instead pointed exclusively to Kujawa's account as providing the chain of events on which the jury should convict Brown. It insisted without qualification, "[I]f what Lauren Kujawa said holds up, this case is over." It described in detail Kujawa's testimony about arriving near Randolph's house, stopping up to two blocks away, watching Brown and Russel leave the car, listening to them argue, hearing loud noises, and seeing Brown reenter the car with a gun. The state then declared emphatically: "Lauren Kujawa starts and ends this case." It could not be clearer to us that even if Randolph's testimony provided some basis beyond speculation for the jury to have inferred that a literal drive-by shooting had occurred, the state's construction of its evidence left no room for the jury to have

done so. The jury had only Kujawa's testimony from which to determine the sequence and timing of events linking the driving to the shooting. And Kujawa's detailed account established that several events occurred between Brown's exiting the vehicle and his discharging the firearm. Brown engaged in an argument of some unknown length "having just exited" the car, but he did not open fire after having just exited. If the legislature intended for every shooting that involves vehicular transportation to and from the scene to constitute a drive-by shooting, it would have chosen different statutory language.

The state proved beyond a reasonable doubt at most that Brown engaged in a drive-near-the-area-get-out-of-the-car-argue-for-awhile-walk-"a few"-blocks-fire-the-gun-walk-back-to-the-car-and-drive-away shooting. Section 609.66, subdivision 1e, does not penalize that conduct, but the state insists otherwise. Having filed no brief because of a misunderstanding, former Douglas County Attorney Christopher Karpan wrote an untimely letter asking this court to recognize the "continuous course of events" as sufficient to satisfy the immediacy element for a drive-by shooting because those events "include[d Brown] being transported to the shooting scene in an automobile and fleeing that scene seconds later in the same automobile." The letter ignores the intervening events and does no more than the trial questioning to quantify the number of those "seconds" that passed between Brown's arrival by car and his flight by car. The evidence strongly suggests that the seconds actually constitute multiple minutes during which intervening events occurred. Various more fitting criminal statutes were available and likely would have applied to Brown's actions, but we are asked only whether this was a drive-by shooting. It was not.

## DECISION

The record does not contain sufficient evidence to support the finding that Brown discharged a firearm "having just exited from a motor vehicle," and the evidence therefore does not support the jury's guilty verdicts for felony drive-by shootings.

**Reversed.**