STATE OF MINNESOTA

IN SUPREME COURT

A14-2130

Hennepin County                                                    Gildea, C.J.

State of Minnesota,

Respondent,

vs.                                                    Filed:  September 14, 2016
                                                       Office of Appellate Courts

Marlon Rashaad Robertson,

Appellant.

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Kelly O'Neill Moller, Assistant Hennepin County Attorney, Minneapolis, Minnesota, for respondent.

Bradford Colbert, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.      The State presented sufficient evidence to sustain appellant's convictions.

2.      The district court did not commit reversible error by disallowing certain defense evidence offered at trial.

3.      Appellant was not denied his constitutional right to the effective assistance of trial counsel.

1

4.     Appellant, who was not a juvenile at the time the crime was committed, was not entitled to a sentencing hearing under *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455 (2012).

5.     Appellant's pro se claims lack merit.

Affirmed.

O P I N I O N

GILDEA, Chief Justice.

Following a jury trial, appellant Marlon Rashaad Robertson was convicted of several offenses, including first-degree premeditated murder for the shooting death of Kevin Braziel, in violation of Minn. Stat. § 609.185(a)(1) (2014).  On direct appeal, Robertson presents a number of claims.  First, he claims the State presented insufficient evidence to sustain his convictions.  Second, he contends the district court committed reversible error when it disallowed certain defense evidence at trial.  Third, he asserts he was denied effective assistance of counsel when trial counsel decided not to interview a potential witness.  Fourth, he claims he was entitled to a sentencing hearing under *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455 (2012).  Finally, he asserts various other claims in a pro se supplemental brief.  Because the evidence was sufficient to sustain the convictions, the district court did not commit reversible error by disallowing defense evidence offered at trial, Robertson was not denied effective assistance of trial counsel, he was not entitled to a sentencing hearing under *Miller v. Alabama*, and his pro se claims lack merit, we affirm.

The shooting at issue happened in June 2013 but the State's theory at trial was that the shooting was related to a robbery that occurred in April 2013. Kevin Braziel's friend, M.S., was the victim of that robbery. M.S. was at a party at the home of Robertson's girlfriend. During the party, three of Robertson's gang associates robbed M.S. at gunpoint. M.S. identified the robbers as M.B., K.W., and W.J. Robertson was also present during the robbery, though M.S. stated that Robertson "wasn't really an active participant." A few days after the robbery, Robertson sent M.S. a Facebook message stating, "It's crazy how y[o]u turn[ed] on me." M.S. responded by accusing Robertson of setting up the robbery and noting that Robertson did not come to his aid when the other individuals robbed and threatened to kill him. Robertson later sent a series of Facebook messages to an unidentified friend, claiming that M.S. admitted to being a snitch, "ha[d] police cards in his pockets," and was responsible for the incarceration of one of Robertson's friends.

Two months later, on June 24, 2013, Braziel was shot and killed while talking to M.S. and J.H. in a North Minneapolis parking lot.[1] The State contended that Robertson's intended target was M.S., a "known prosecution witness" in connection with the April robbery. Rather than shooting M.S., however, Robertson shot Braziel.

S.L. was nearby when the shooting happened. She had opened the driver's side door of her vehicle and was changing her shoes when she noticed a young adult black male with a dark complexion, of average height (5'8 to 5'10) and average build, walking eastward. The individual was 5 to 7 feet away from S.L. as he passed behind her car. She

---

[1]     J.H. was a father-figure to Braziel.

3

saw "some[]" of the individual's face, but got a better look at his clothing and footwear. The individual was wearing "[a] white shirt with wording on it and tan jeans," and a pair of Timberland boots that "were [] a distinctive autumn color" that S.L. had "never seen [] before." S.L. explained that she specifically noticed the boots and her "eyes drew to them" because she had planned on asking the individual where he had purchased them. Shortly thereafter, she heard six to seven "boom[s]" and saw "shells flying." Three of the bullets struck Braziel.[2] S.L. then saw the same individual walk back behind her car, with "his hand underneath his shirt like he was tucking something away." The individual ran westward, and S.L. heard someone calling out for help.

When the police arrived at the scene, Braziel was bleeding heavily and unable to speak. J.H. told the officers that he did not see the shooter. M.S. asked to be taken to the police station before providing a statement. Once he arrived at the station, M.S. stated that he, rather than Braziel, was likely the intended victim of the shooting because of the arrests that were made after he reported the April robbery. Although M.S. initially reported that he had "nothing to tell" the officers about who was trying to shoot him, he later suggested

_____

[2] One of the bullets travelled through Braziel's neck, injured his carotid artery, and ultimately lodged in the base of his tongue. Braziel suffered additional wounds to his left thigh and his buttocks, and died in the hospital 12 days later, on July 6, 2013. An additional bullet entered the front window of a café, located directly across from the parking lot. A piece of the bullet injured a cook at the café, causing coworkers to call 911. Robertson was convicted of second-degree assault for the injury to the cook.

4

that the YNT ("Young N Thuggin") or Taliban gangs may have been behind the shooting, and he told the police the names of those who had robbed him (M.B. and W.J.).[3]

An initial search of the scene revealed eight 9-millimeter discharged shell casings scattered around the alley behind the parking lot. A forensic scientist with the Crime Lab Unit of the Minneapolis Police Department concluded that, based on the placement of the casings, the shooter was likely standing in the alley and firing through a gap in a fenced-in dumpster area, with a view of both the parking lot and the café located directly across from the parking lot. Multiple security and traffic cameras recorded the events surrounding the shooting. In addition to recording J.H., M.S., and Braziel as they took cover from the shots, the footage depicts a blue Oldsmobile with plastic tape covering a small back window, a car registered to M.B.'s girlfriend, driving down the alley shortly before the shooting. A man in a white shirt is seated in the front passenger seat. After the shooting, another camera recorded a man in a white t-shirt running down the alley and through L.S.'s yard.[4]

The day after the shooting, June 25, 2013, Robertson published a post to his Facebook page that read: "Lmfao . . . [they] must forgot solo was on they ass!!!!free my hittas." According to law enforcement trained in gang-related crimes, the statement roughly translates to: "Laughing my [] ass off . . . !!!! Free my friends who have been charged with a crime." At the time of the shooting, Robertson's gang associates W.J. and

---

[3] M.S. did not report the name of the third robber, later identified as K.W., because he "didn't have the name" at the time of his report.

[4] L.S. gave police a limited description of a young black male in a white t-shirt. L.S. passed away before trial.

K.W. were still in jail for the April robbery of M.S. M.B., however, had posted bail and was no longer in custody. "Solo" was Robertson's street name.

Sometime between June 25 and June 27, 2013, Robertson sold the gun used in the shooting, a gun Devante Parker identified as Robertson's "heat." Specifically, Robertson and M.B. met Parker and his associates in a North Minneapolis alley to sell the gun.[5] When asked if the gun worked, Robertson replied that he knew it worked because he had "just shot it." At the time of the sale, the gun's slide was "cocked back" like it had just been unloaded.

Four days after the shooting, S.L. reviewed a photographic lineup of potential suspects. She originally told police she was not sure she would be able to identify the shooter in a lineup, but later stated she thought she could recognize the individual she saw walking down the alleyway before and after the shooting. An officer who was unfamiliar with the case presented S.L. with a series of six photographs, one at a time, as a sequential lineup. As she reviewed the photos, S.L. said she was "stuck between" two photos because "[t]he males looked similar." According to the officer administering the lineup, S.L. then "isolated two photos and set the other four aside and seemed to concentrate on [the] two photos." The officer informed her that she was not allowed to do this but was instead required to review all six of the photos if she wished to examine a photo for the second time. S.L. eventually identified an individual other than Robertson as the shooter.

---

[5]     Based on a tip from a confidential informant, police arrested Parker for being a felon in possession of a firearm, Minn. Stat. § 609.165, subd. 1b (2014). Parker admitted to police that he bought the gun from Robertson.

Robertson's photograph, however, was the other photo S.L. initially set aside for further review. Following the lineup, the officer informed the investigator on the case that S.L. was torn between the two photographs she initially isolated, and video footage confirmed that she was uncertain in her final selection.

On July 31, 2013, the police executed a search warrant of Robertson's house and located a pair of autumn-colored Timberland boots. Police also located a Facebook profile picture in which Robertson was wearing the distinctive autumn-colored boots and a pair of tan pants.

The day after the search, the police interviewed Robertson. Robertson denied his involvement and stated that he did not know where he was on the day of the shooting. He did, however, admit that the autumn-colored boots found in his apartment were his and acknowledged that he exchanged a series of Facebook messages with M.S. following the robbery. He said that he had heard from multiple people that M.S. was a "snitch," but that he "wasn't positive . . . because he hadn't seen papers" indicating that M.S. was a confidential informant. Robertson further stated that he was a member of the Four Corner Hustler gang, as well as the Black Mob and YNT, and that he associated with members of the Taliban gang. When asked, Robertson denied knowing that M.B.'s girlfriend owned a blue Oldsmobile and that M.B. often drove the car.

On his first night in jail, Robertson placed a recorded phone call to a friend. He told his friend he was being charged with second-degree murder, but the evidence against him was "weak." Robertson stated that all the police were going off of was "my shoes . . . and a witness." Robertson then read from his criminal complaint a summary of the evidence

7

against him. When Robertson read the portion of the complaint describing the autumn-colored Timberland boots the witness noticed the shooter wearing, he commented, "[t]hey talking about my Tims." Lastly, Robertson reported that the police showed him a picture of a car that he recognized as belonging to M.B.'s girlfriend, the blue Oldsmobile that was spotted at the scene of the shooting, but Robertson said he told police he did not know who owned the car.

After the grand jury indicted Robertson for first-degree premeditated murder, Robertson released annotated pages from the grand jury transcript to a friend who visited him in jail. The friend then gave the pages to one of Robertson's gang associates, who uploaded copies of the pages to Facebook. The transcript referred to the witnesses who were present for the sale of the murder weapon and who testified against Robertson only by letter designation. Nevertheless, Robertson was able to correctly list in the transcript margins the street names of those witnesses. Robertson also noted the identity of the confidential informant and the amount of money the informant was paid for "set[ting] up" Devante Parker's arrest for possession of the murder weapon. The individual who posted the transcript pages said that he did so because he wanted to publicize the identities of the witnesses who were testifying against Robertson.

Shortly before his case went to trial, Robertson sent a letter to someone who was in jail with Devante Parker. Robertson instructed the inmate to inform Parker that the State was going to call Parker as a witness in the case against Robertson, and to tell Parker not to appear, but that if he did, to assert his Fifth Amendment right to remain silent. The letter

was signed by "Blackmob Solo," Robertson's alias. Parker confirmed that his cellmate told him that Robertson had written a letter asking Parker to "take [his] plea back."

At trial, Robertson did not testify, nor did the defense present any other witnesses. Rather, defense counsel argued in closing argument that M.S. and Robertson were friends and that the evidence also supported the conclusion that either M.B. or Devante Parker was the shooter. The defense also attacked Parker's credibility, and alleged that he was colluding with M.B.

The jury found Robertson guilty on all eight counts charged, including first-degree premeditated murder, Minn. Stat. § 609.185(a)(1).[6] Robertson was convicted of five counts and sentenced to life imprisonment without the possibility of release. This appeal follows.

On appeal, Robertson argues that (1) the State failed to present sufficient evidence on the identity of the shooter; (2) the district court committed reversible error by disallowing admission of certain defense evidence at trial; (3) he received ineffective assistance of trial counsel; and (4) he was entitled to a sentencing hearing under the

---

[6]     Robertson was also found guilty of intentional murder in the second degree, Minn. Stat. § 609.19, subd. 1(1) (2014) (Braziel); attempted murder in the first degree, Minn. Stat. § 609.17 (2014); *see* Minn. Stat. § 609.185(a)(1) (J.H.); attempted intentional murder in the second degree, Minn. Stat. § 609.17; *see* Minn. Stat. § 609.19, subd. 1(1) (J.H.); attempted felony murder in the first degree, Minn. Stat. § 609.17; *see* Minn. Stat. § 609.185(a)(3) (2014) (M.S.); attempted intentional murder in the second degree, Minn. Stat. § 609.17; *see* Minn. Stat. § 609.19, subd. 1(1) (M.S.); aggravated tampering with a witness in the first degree, Minn. Stat. § 609.498, subd. 1b(a)(1) (2014) (M.S.); and assault in the second degree, Minn. Stat. § 609.222, subd. 1 (2014) (café cook).

Supreme Court's decision in *Miller v. Alabama*. Robertson also asserts a number of errors in a pro se brief. We consider each argument in turn.

I.

We turn first to Robertson's argument that the evidence presented at trial was insufficient to identify Robertson as the shooter. When an appellant challenges the sufficiency of the evidence presented at trial, we review the evidence "to determine whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged." *State v. Fairbanks*, 842 N.W.2d 297, 306-07 (Minn. 2014) (quoting *State v. McArthur*, 730 N.W.2d 44, 49 (Minn. 2007)). We view the evidence presented in the light most favorable to the verdict and assume that the jury disbelieved any evidence in the record that conflicted with the verdict. *State v. Fox*, 868 N.W.2d 206, 223 (Minn. 2015).

Both the State and Robertson address the sufficiency of the evidence under the circumstantial evidence standard.[7] Under that standard, we review the evidence using a two-step analysis. *State v. McAllister*, 862 N.W.2d 49, 53 (Minn. 2015). We "[f]irst . . . identify the circumstances proved, giving deference 'to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State.' " *State v. Anderson*, 789 N.W.2d 227, 241-42 (Minn. 2010) (quoting *State v. Andersen*, 784 N.W.2d 320, 329 (Minn. 2010)). We then

---

[7]     Because the evidence here is sufficient to identify Robertson as the shooter even under the stricter circumstantial-evidence standard, we need not resolve whether the direct-evidence or circumstantial-evidence standard applies here.

10

"independently examine 'the reasonableness of all inferences that might be drawn from the circumstances proved,' including inferences consistent with a hypothesis other than guilt." *State v. Hurd*, 819 N.W.2d 591, 599 (Minn. 2012) (quoting *Anderson*, 789 N.W.2d at 242). In order "[t]o sustain a conviction based on circumstantial evidence, the reasonable inferences that can be drawn from the circumstances proved as a whole must be consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of guilt." *Fox*, 868 N.W.2d at 223; *see also McAllister*, 862 N.W.2d at 58. Applying that standard here, we conclude that the evidence was sufficient to identify Robertson as the shooter.

The circumstances proved at trial and described above are consistent with a reasonable inference of guilt. S.L. provided a description of the shooter that included a pair of distinctive autumn-colored Timberland boots. A pair of autumn-colored Timberland boots were recovered from Robertson's house. Robertson admitted on a jailhouse phone call that the police discussed *his* shoes and *his* description in the criminal complaint. Robertson had previously argued with M.S. in the months leading up to the shooting and had a motive to silence him about the robbery, *see State v. Silvernail*, 831 N.W.2d 594, 600 (Minn. 2013) (using motive to kill as circumstantial evidence of guilt). Robertson sold the murder weapon the day after the shooting, told the buyer he had "just shot" the gun so he knew it worked, and later identified the people involved in the sale, *see State v. Olhausen*, 681 N.W.2d 21, 29 (Minn. 2004) (recognizing inculpatory actions taken after a crime was evidence of guilt). When viewed as a whole, the circumstances proved support a rational inference that Robertson was the shooter.

11

We next consider whether the circumstances proved are consistent with a rational inference other than guilt. Robertson contends that it is reasonable to infer that either M.B. or Devante Parker was the shooter because the eyewitnesses failed to identify Robertson in the photographic lineups, there was testimony that he and M.S. were friends and that he did not actively participate in the robbery, and that his sale of the murder weapon, by itself, does not point unerringly to guilt. When viewed in isolation, the facts cited by Robertson might support a rational inference other than guilt. But we view the circumstances proved as a whole. *State v. Boldman*, 813 N.W.2d 102, 107 (Minn. 2012).

Although there is evidence in the record that Robertson and M.S. were friends, there is also evidence that M.S. had recently "turn[ed]" on Robertson and that M.S. blamed Robertson for not intervening in the robbery. When there is a conflict in the evidence, we must defer to the jury's factual determinations and reject evidence that is inconsistent with the verdict. *See State v. Hawes*, 801 N.W.2d 659, 668-69 (Minn. 2011). Additionally, both S.L. and L.S. saw only one individual flee the area from the location where the shots were fired, and S.L. testified that the individual was wearing distinctive autumn-colored Timberland boots. The police found autumn-colored Timberland boots during a search of Robertson's home. Robertson admitted during the jail call that the police described *his* footwear and *his* appearance in the criminal complaint against him. During the sale of the murder weapon, Robertson told Parker that he had "just fired" the gun. In short, when viewed as a whole, the circumstances proved do not support a rational inference that someone else was the shooter. We therefore hold that the State presented sufficient evidence to sustain Robertson's convictions.

12

## II.

We turn next to Robertson's argument that the district court committed reversible error in three evidentiary rulings. Specifically, Robertson argues that the court erred by refusing to admit Robertson's entire recorded interview with the police under Minn. R. Evid. 106. He also argues that the district court erred in sustaining objections to two questions the defense asked the interrogating officer that were designed to elicit that Robertson had denied involvement in the shooting. Robertson argues that without the testimony, the jury was misled. Finally, Robertson argues the court improperly sustained the State's hearsay objection when defense counsel asked a police investigator whether L.S. had failed to identify Robertson.

A district court's evidentiary rulings will not be reversed absent a clear abuse of discretion, and we "largely defer to the trial court's exercise of discretion in evidentiary matters and will not lightly overturn a trial court's evidentiary ruling." *State v. Kelly*, 435 N.W.2d 807, 813 (Minn. 1989). Robertson bears the burden to show that the district court abused its discretion. *State v. Atkinson*, 774 N.W.2d 584, 594 (Minn. 2009). We consider each alleged error in turn.

## A.

Robertson first challenges the district court's denial of his request that the entirety of his recorded interview with the police be admitted into evidence under Minn. R. Evid. 106. Rule 106 provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any

other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."

Our interpretation of Rule 106 in *State v. Bauer* confirms that Robertson has not met his burden to show an abuse of discretion. In *Bauer*, the State introduced several incriminating statements by the appellant through the testimony of police officers who interviewed Bauer during the course of their investigation. 598 N.W.2d 352, 368 (Minn. 1999). We concluded that Rule 106 did not allow the admission of Bauer's entire recorded interview where "the state did not introduce any part of the actual recordings [or transcripts] into evidence." *Id.* And we held that "a trial court may properly exclude self-serving portions of a recorded interview of a criminal defendant, even though it had allowed police to testify as to certain admissions the defendant made in that interview."[8] *Id.* at 368-69 (citing *State v. Mills*, 562 N.W.2d 276, 286 (Minn. 1997)).

Here, as in *Bauer*, the State did not introduce any portion of the actual recording or transcript of Robertson's recorded statement. The statements at issue were introduced through testimony of the interrogating officer. Accordingly, Rule 106, by its plain terms, does not apply. Moreover, as the district court aptly observed, allowing Robertson to admit the entire interview under the circumstances of this case would have improperly permitted Robertson to testify at trial in "an indirect way." *See State v. Taylor*, 258 N.W.2d 615, 622 (Minn. 1977) (discussing concerns with the possibility of allowing the defendant to testify

---

[8]     A statement of a party opponent is not hearsay when *offered against* the party opponent and several other conditions are met. Minn. R. Evid. 801(d)(2); *Bauer*, 598 N.W.2d at 368.

without an opportunity for cross-examination).  Finally, the district court informed defense counsel that "if the defense had portions [of the interview] that they believed were misleading because qualifications or additional statements about the answers were made that the State didn't include, then the rule of completeness would permit the defense to go into that."  On appeal, Robertson does not point to any specific portions of his police interview that he contends were needed in response to the district court's invitation.  Rather, Robertson insists that because the interrogating officer testified about statements Robertson made, Robertson was entitled to admit the entire transcript of the interview.  Robertson's argument finds no support in Rule 106.

Robertson cites *United States v. Pacquette*, 557 F. App'x 933 (11th Cir. 2014), for the proposition that the "fairness standard in Rule 106" has been extended to oral statements.  There, the U.S. Court of Appeals for the Eleventh Circuit stated that "the exculpatory portion of the defendant's statement should have been admitted if it was relevant to an issue in the case and necessary to clarify or explain the portion received." *Id.* at 937.  Robertson also cites *State v. Kiewel*, where we held that "[w]here the inculpatory part [of a conversation] is admitted [the defendant] has the right to have the exculpatory part" of the conversation admitted.  173 Minn. 473, 479, 217 N.W. 598, 600 (1928).

Both *Pacquette* and *Kiewel* are factually distinguishable.  In *Pacquette*, a defendant made a statement to the police that he owned an identified bag and all of its contents. 557 F. App'x at 937.  Later, the police informed the defendant that drugs had been found in the bag, but the defendant denied knowledge of the drugs' presence. *Id.*  At trial, the police testified that the defendant admitted to owning everything in the bag, insinuating

15

that the defendant claimed ownership of the drugs. *Id.* The court held that the defendant should have been allowed to clarify that he denied ownership of the drugs. *Id.* Similarly, the jury was left with the impression in *Kiewel* that the defendant admitted a criminal act when evidence was introduced that he had entered into a civil settlement in a misappropriation of property case. 173 Minn. at 479, 217 N.W. at 600-01. Kiewel was then allowed to introduce evidence that entering into a civil settlement did not amount to an admission that he had committed a crime. *Id.* Unlike in *Pacquette* and *Kiewel*, the State in this case did not offer evidence that Robertson told the police he was involved in the shooting. The jury, therefore, was not left with a misimpression that required clarification.

Robertson further argues that Rule 106 applies to oral statements admitted at trial under Minn. R. Evid. 611(a), which allows the court to "exercise reasonable control over the mode and order of . . . presenting evidence so as to . . . make the . . . presentation effective for the ascertainment of the truth." Even if we analyzed the evidentiary ruling at issue under Rule 611(a), the admission of the entire interview is not necessary to "give the jury a full understanding of the facts," nor to correct an impression that Robertson did not deny involvement in the shooting. *See Mills*, 562 N.W.2d at 286-87.

This is so because the interrogating officer did not testify or suggest that Robertson admitted involvement in the shooting. The officer testified that Robertson said he did not remember where he was the day of the shooting and that he was not familiar with the blue Oldsmobile linked to M.B. The officer also testified that Robertson admitted his gang affiliations and did not deny his confrontational Facebook conversation with M.S., who Robertson "had heard . . . was a snitch." The district court also allowed evidence, through

16

the officer, that Robertson claimed ownership of the Timberland boots found in his apartment and depicted in his Facebook profile picture.

Moreover, on cross-examination of the officer, defense counsel was allowed to elicit testimony that Robertson denied having anything to do with the shooting. Defense counsel also stressed that the officer testified about only a "small part" of the nearly 50-page interview with Robertson, and that although Robertson admitted he had heard M.S. was a snitch, he also told the officer that he "never heard" that "people have the green light to shoot him." The officer further testified on cross-examination that Robertson claimed he did not wear the Timberland boots around the time of the shooting, and provided an explanation for some of the Facebook messages he and M.S. had exchanged. Based on the cross-examination, Robertson's contention that the jury was left with a misimpression of the interview is unavailing.

In short, our review of the record establishes that the district court exercised reasonable control over the presentation of evidence. *See* Minn. R. Evid. 611(a). Based on this record, we hold that the district court did not abuse its discretion when it denied Robertson's request that the entirety of his recorded interview with the police be admitted into evidence.

B.

Robertson also contends that the district court committed reversible error when it sustained the State's objections to defense counsel's questions to the interrogating officer about whether Robertson "denied . . . ever possess[ing] th[e] [9-millimeter] gun" and whether Robertson ever "admit[ted] to this shooting." According to Robertson, defense

17

counsel's questions were proper because the testimony of police officers who had interviewed Robertson during the course of their investigation left the jurors with the misleading impression that Robertson did not deny possession of the gun and did not deny committing the shooting. The record that we summarize above does not support Robertson's contention that the jury was misled.

But even if the district court abused its discretion by sustaining the State's objections to the two questions defense counsel posed, the error was harmless.[9] While cross-examining the officer who interviewed Robertson, defense counsel elicited, without objection, testimony that Robertson "denied that he had anything to do with the shooting." In light of this testimony, the verdict in this case was surely unattributable to the alleged error.

C.

Next, Robertson contends that the district court committed reversible error by sustaining the State's hearsay objection when defense counsel asked a police investigator whether L.S. failed to identify Robertson. Defense counsel made no offer of proof in response to the objection, and argues for the first time on appeal that L.S.'s failure to identify the shooter was not hearsay, and if it were hearsay, that it should have been admitted under the residual hearsay exception.

---

[9] Because Robertson alleges that the district court's evidentiary rulings deprived him of his constitutional right to present a complete defense, we must be satisfied that any abuse of discretion is harmless beyond a reasonable doubt. *See State v. Townsend*, 546 N.W.2d 292, 297 (Minn. 1996). An evidentiary ruling is harmless beyond a reasonable doubt when the verdict is "surely unattributable" to the error. *State v. Richardson*, 670 N.W.2d 267, 279 (Minn. 2003) (quoting *State v. Juarez*, 572 N.W.2d 286, 292 (Minn. 1997)).

Because Robertson raises these arguments for the first time on appeal, we review the alleged errors for plain error. Under this standard, Robertson must establish that (1) there was an error; (2) the error was plain; and (3) the error affected his substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). If Robertson fails to establish that the claimed error affected his substantial rights, we need not consider the first two factors. *State v. Rossberg*, 851 N.W.2d 609, 618 (Minn. 2014). On the other hand, if all "three prongs are established, we will correct the error only if the error seriously affects the fairness, integrity, or the public reputation of judicial proceedings." *State v. Matthews*, 800 N.W.2d 629, 634 (Minn. 2011).

We first consider whether the district court erred when it concluded that L.S.'s failure to identify the shooter was hearsay. The Minnesota Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Minn. R. Evid. 801(c). A statement includes "nonverbal conduct . . . if it is intended by the person as an assertion." Minn. R. Evid. 801(a). Here, Robertson attempted to introduce L.S.'s nonverbal out-of-court assertion—namely that L.S. was unable to identify the shooter— for its truth. Consequently, the district court did not err when it concluded that L.S.'s failure to identify the shooter was a nonverbal assertion that fell within the definition of hearsay.[10]

---

[10] Robertson cites an unpublished Wisconsin decision for the proposition that when nonverbal conduct is offered for an "implied assertion," it is not hearsay. *Shier v. Fed. Life Ins. Co.*, No. 84-261 (Wis. Mar. 21, 1986) (unpublished disposition). The decision cited

19

Having concluded that L.S.'s inability to identify the shooter was hearsay, we consider whether the district court committed plain error by not considering sua sponte whether L.S.'s inability to identify the shooter was admissible under the residual exception to the hearsay rule, Minn R. Evid. 807.[11] We need not and do not consider the first two steps of the plain error analysis because Robertson has not shown that the alleged error affected his substantial rights. An error affects substantial rights if there is a reasonable likelihood that it substantially affects the verdict. *Rossberg*, 851 N.W.2d at 618. Having carefully reviewed the record, we conclude that there is no reasonable likelihood that the verdict would have been substantially affected had the jurors learned that L.S. was unable to identify Robertson during a photo lineup. The jurors knew that L.S. had provided the police a "very limited description" of the shooter, telling police only that the shooter was a young black male in a white t-shirt. Informing the jury that L.S. was unable to identify Robertson as the shooter in a photo lineup would have added little new information. Assessing the minimal value of this evidence against the strength of the other evidence of Robertson's guilt, which we detail above, makes clear that there is no reasonable likelihood

---

has no precedential value, Wis. R. App. P. 809.23(3), and in any event is inapposite because L.S.'s inability to identify the shooter was not offered for an implied assertion. Instead, it was offered to prove the truth of L.S.'s out-of-court assertion, namely that he was unable to identify the shooter.

[11] This rule provides that "[a] statement not specifically covered by rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that" certain conditions are met. In addition to meeting the specified requirements, the proponent of the hearsay evidence must "provide the adverse party with a fair opportunity to prepare to meet it," including the provision of the declarant's "name, address and present whereabouts." Minn. R. Evid. 807.

that the verdict would have been substantially affected had the jurors learned that L.S. was unable to identify Robertson during a photo lineup. We therefore hold that the district court did not commit plain error by sustaining the State's hearsay objection when defense counsel asked a police investigator whether L.S. had failed to identify Robertson.

III.

We turn next to Robertson's contention that he was denied effective assistance of trial counsel because his attorney failed to interview M.S., the alleged target of the shooting, or call him as a witness at trial.[12] The State responds that defense counsel made a strategic trial decision to not interview M.S., and that this decision is not subject to review on appeal.

To establish a claim for ineffective assistance of counsel, Robertson must prove "(1) that his counsel's representation 'fell below an objective standard of reasonableness'; and (2) 'there is a reasonable probability that, but for counsel's unprofessional errors, the

---

[12]     As part of his ineffective-assistance-of-trial-counsel argument, Robertson relies on two affidavits that were submitted during a postconviction proceeding that took place during a stay of his direct appeal, arguing that the postconviction court erred in failing to hold an evidentiary hearing on this claim. Robertson did not file a separate notice of appeal within 60 days of the postconviction court's order as required by our order staying his direct appeal. *State v. Robertson*, No. A14-2130, Order at 2 (Minn. filed June 10, 2015). Instead, he filed a letter dated November 5, 2015, in which he asked "the court to vacate the stay of the appellate proceedings and set a briefing schedule." Because the time to file a notice of appeal from an adverse judgment in a postconviction proceeding is jurisdictional, *Hohenwald v. State*, 875 N.W.2d 843, 845 (Minn. 2016), Robertson's reliance on the two postconviction affidavits in this direct appeal is improper, and we therefore do not consider them. When defendants seek to stay a direct appeal to pursue postconviction relief, they must file a separate notice of appeal if they wish to challenge an adverse postconviction judgment.

result of the proceeding would have been different.' " *Nissalke v. State*, 861 N.W.2d 88, 94 (Minn. 2015) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)).

We do not generally review a claim for ineffective assistance of counsel based on trial strategy. *State v. Vang*, 847 N.W.2d 248, 267 (Minn. 2014). But even if we were to review defense counsel's decision not to interview or call M.S. as a witness, Robertson has failed to establish that he suffered prejudice from his counsel's actions. This is so because the testimony Robertson claims M.S. would have provided was elicited at trial through other evidence. Because Robertson has failed to establish a claim of ineffective assistance of trial counsel under *Strickland*, we hold that he is not entitled to a new trial.

IV.

We turn next to Robertson's argument that he was entitled to a sentencing hearing under *Miller v. Alabama*, 132 S. Ct. 2455, before being sentenced to life in prison without the possibility of release. The State responds that the United States Supreme Court has drawn a bright-line rule limiting the application of *Miller* to "juvenile" defendants under the age of 18, and that because Robertson was 22 years old at the time of the shooting, *Miller* does not apply in this case. Robertson counters that if *Miller* does impose a bright-line age classification, the distinction between 18 and 22-year-olds violates the Equal Protection Clause of the United States Constitution.

We recently rejected arguments identical to those Robertson raises in *Munt v. State*, 880 N.W.2d 379, 383 (Minn. 2016). For the reasons we discussed in *Munt*, we hold that *Miller* does not apply to Robertson, who was 22 years old at the time of the shooting, and his equal protection argument is meritless.

V.

Finally, Robertson asserts seven pro se claims, a number of which he raises for the first time on appeal. Robertson argues that (1) he was denied due process of law because the district court allegedly committed plain error in its jury instructions; (2) he was denied due process of law based on the suggestive identification during the sequential line-up provided to witness S.L.; (3) he was denied the right to a fair trial based on alleged prosecutorial misconduct; (4) he was denied the effective assistance of trial counsel when his attorney requested that the district court provide the jury a "no-adverse-inference" instruction without Robertson's clear consent; (5) he was denied a fair trial by the district court's allowance of evidence from his Facebook account; (6) the evidence presented at trial was insufficient as a matter of law to support his conviction of first-degree murder; and (7) his sentence must be reduced as it exceeded the statutory maximum allowed under Minnesota law. After carefully considering each argument in full, we conclude that Robertson's pro se claims lack merit.

Affirmed.