*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A24-1089**

State of Minnesota,
Respondent,

vs.

Jamarcus Jamond Morris,
Appellant.

**Filed August 18, 2025
Affirmed
Smith, Tracy M., Judge**

Stearns County District Court
File No. 73-CR-22-6021

Keith Ellison, Attorney General, Lydia Villalva Lijó, Assistant Attorney General, St. Paul, Minnesota; and

Janelle Kendall, Stearns County Attorney, St. Cloud, Minnesota (for respondent)

Andrew C. Wilson, Special Assistant Public Defender, Wilson & Clas, Minneapolis, Minnesota (for appellant)

Considered and decided by Johnson, Presiding Judge; Worke, Judge; and Smith, Tracy M., Judge.

**NONPRECEDENTIAL OPINION**

**SMITH, TRACY M.**, Judge

Appellant Jamarcus Jamond Morris appeals from the final judgment of conviction for four counts of aiding and abetting attempted first-degree murder, challenging the

sufficiency of the evidence to prove his identity as a masked shooter. Because the evidence is sufficient, we affirm.

## FACTS

Morris's convictions stem from a shooting in St. Cloud in the afternoon of July 6, 2022. On that date, two groups of men and juveniles gathered for a planned fistfight between a member of each group. Instead of a fistfight, three men from one group opened fire on the other group, hitting and wounding four people. One of the shooters was masked. The police believed Morris was the masked shooter, and he was charged accordingly. The following factual summary is derived from the testimony and exhibits admitted at Morris's trial.

### *The Shooting*

The incident was captured on video from a security camera on a nearby building. At 5:44 p.m. on July 6, a white Nissan Sentra entered and parked in a residential parking lot in St. Cloud. An individual with a slim build wearing a white balaclava-style mask, which covered their entire face except for the eyes, and a sweatshirt with the hood pulled over their head exited through the driver's door. Several individuals were gathered nearby. The masked driver walked toward three of the individuals, who were later identified as Daquan Ledbetter, Bryant Garth II, and T.S. The driver then returned to the Sentra with the three men. The driver opened the driver's door, and Ledbetter, Garth, and T.S. stood by the passenger-side doors of the vehicle.

Another group of individuals was gathered at the end of the parking lot, several car-lengths from where the Sentra was parked. Some of these individuals were gathered for the

2

anticipated fistfight, and some were bystanders. When the masked driver and the three other men went to the Sentra, persons from the group at the end of the lot began shouting insults at them and taunting them about leaving.

The masked driver and the three other men paused at the car, looking at each other and toward the other group. Then the masked driver, Ledbetter, and Garth pulled out firearms and began moving across the lot, toward the other group. Some members of the other group started walking or running away. The masked driver began running toward the other group, raised their gun, and, for about six seconds, fired at the other group, shifting their aim as they shot. Ledbetter and Garth also fired toward the other group.

When the shooting stopped, the masked driver, Ledbetter, Garth, and T.S. ran back to the Sentra. The masked driver entered the car through the driver's door, which they had left ajar. Ledbetter, Garth, and T.S. also entered the vehicle, and they then drove out of the lot.

The gunshots struck and wounded four individuals. One victim was shot in the arm. A second victim was shot in the back of the head. A third victim—a juvenile—was struck in his shoulder and head. And the fourth victim was struck in his back. All four survived their injuries.

### The Investigation

Police officers arrived at the scene within six minutes of the shooting. They gathered evidence from the area, including a total of 28 bullet casings and a single live cartridge. They identified three distinct groupings of casings corresponding to the locations of the three shooters. In the spot where the masked shooter had stood and fired, investigators

3

found 16 nine-millimeter bullet casings and the single live cartridge. The police reviewed surveillance footage of the shooting, and based on the footage, an investigator concluded that the driver had fired a MAC-10 or MAC-11 fully automatic submachine gun. Such a firearm is capable of firing 20 to 30 rounds of nine-millimeter bullets.

The same investigator also reviewed surveillance videos of Morris that were taken in the two days preceding the shooting and determined that the masked shooter had a "very similar build" to Morris, based on Morris's appearance in the videos. The first video was from July 4, and it showed Morris at a gas station with Ledbetter, Garth, T.S., and others. The second video was from July 5, the eve of the shooting, and it showed Morris involved in a fistfight outside of a different gas station, in which a group that Morris was associated with attacked two individuals, L.J. and B.B. L.J. is one of the four individuals who suffered gunshot wounds on July 6.

As part of the investigation, the police looked for the Sentra that the masked shooter had driven on July 6. The Sentra was registered to the mother of a woman named J.S. On July 7, the police located the Sentra outside of J.S.'s apartment building in Sartell and determined J.S. to be the regular driver of the car. J.S. is also the mother of one of Morris's children. J.S. consented to a police search of the Sentra and her apartment.

During the search of the Sentra, officers found a receipt in the glove compartment from April 2022 with Morris's name on it and a gun case in the trunk containing a magazine for a handgun. They collected DNA swabs from all four door handles and the steering wheel. They sent the swabs to the Minnesota Bureau of Criminal Apprehension (BCA) for testing and comparison to a DNA sample that had been taken from Morris. A BCA forensic

4

scientist tested the samples and determined that there was the highest probability that the BCA can report that Morris was one of three DNA contributors to the front driver's side interior door handle.

During the search of J.S.'s apartment, the police found a wallet containing Morris's identification card and other cards in his name. About a month after the shooting, the officers returned to J.S.'s apartment and conducted another search pursuant to a warrant. They encountered Morris in the residence and found a white balaclava-style mask with prominent red lettering on one side. During that search, the police also found an extended magazine for a .45-caliber handgun.

Also, six days after the shooting, the police ordered a "trash pull" of Morris's mother's home for evidence related to the shooting. In her garbage, they found a live nine-millimeter round that was from the same manufacturer as one of the casings found at the scene of the shooting near where the masked shooter had used their firearm. The police then obtained and executed a search warrant for Morris's mother's home, where they found a box of nine-millimeter ammunition and a loose bullet.

The police also obtained cellphone-tower data from the day of the shooting related to four suspects, including Morris. A criminal-intelligence analyst reviewed and analyzed the data. The data showed that Morris's cellphone connected to towers near J.S.'s apartment in Sartell from 1:06 p.m. to 5:26 p.m. At 5:27 p.m., his cellphone began to connect with other towers, including one near the border between Waite Park and St. Cloud. At 5:41 p.m., Morris's cellphone connected to a tower that was further southeast,

toward the area where the shooting occurred. The next connection his cellphone made was to a tower in Sauk Rapids at 5:55 p.m., after the shooting had taken place.

Additionally, the police reviewed records from Morris's social-media accounts and cellphone, including four series of Facebook messages between Morris and other users. In the first series, sent two-and-a-quarter hours before the shooting, Morris wrote that someone was "trying [to] trade [him] Glock 17 peanut butter for [his] Mac." An investigator testified at Morris's trial that, based on his training and experience, "Glock" referred to a type of handgun similar to that carried by St. Cloud police officers and that "Mac" likely referred "to a MAC-10 or MAC-11 fully automatic machine gun," which is the style of firearm that the police concluded was used by the masked shooter. In the second series of messages, also sent on the day of the shooting, another user said to Morris that the user "need[ed] a banger." The investigator testified that "banger" referred to a firearm. In the third series of messages, also sent on July 6, Morris told a user named "John Wick" to "meet [him] at spot" and to do so "[a]t 6." In the fourth series of messages, Morris received a message from T.S. on the eve of the shooting that stated that T.S. was going to "be at the building in 10 minutes." Additionally, officers reviewed a Snapchat post made by Morris, which was published shortly before his jury trial began, that stated, "Trial on Monday for the whole week y'all come show support and see[] who the rats [are]."

On Morris's cellphone, the police found a photograph of a MAC-10 or MAC-11 lying on a floor. They also found several screenshots saved to the phone, including a Facebook post from a Minnesota crime-watch group about the July 6 shooting and an excerpt from a news article on the same topic. The police also obtained messages that

Morris had sent from the Wright County Jail in which he told someone, "[T]ry take videos of him driving car . . . so they can know [I'm not] the only mf driving that car."

***Charges, Trial, and Sentencing***

Respondent State of Minnesota charged Morris with four counts of second-degree assault in violation of Minnesota Statutes section 609.222, subdivision 1 (2020)—one count for each of the shooting victims. The state later amended the charges to aiding and abetting second-degree assault and added four counts of aiding and abetting attempted first-degree premeditated murder in violation of Minnesota Statutes sections 609.05, subdivision 1, 609.17, subdivision 1, and 609.185(a)(1) (2020).

The case proceeded to a jury trial. The jury found Morris guilty of all counts charged. The district court convicted Morris of four counts of aiding and abetting attempted first-degree murder and imposed four consecutive 216-month prison sentences for the offenses.

Morris appeals.

## DECISION

Morris argues that his convictions must be reversed because the evidence is insufficient to prove his identity as the masked shooter.

When reviewing whether evidence is sufficient to support a conviction, appellate courts determine, based on "the facts in the record and the legitimate inferences that can be drawn from those facts," whether the jury could have reasonably concluded that the appellant was guilty of the charged offense. *State v. Robertson*, 884 N.W.2d 864, 871 (Minn. 2016) (quotation omitted). This requires "a painstaking analysis of the record to

7

determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient." *State v. Horst*, 880 N.W.2d 24, 40 (Minn. 2016) (quotation omitted).

When, as here, the state relies solely on circumstantial evidence to prove an element of the crime, appellate courts apply "a heightened two-step standard of review" to determine whether the evidence is sufficient to support the conviction. *State v. Isaac*, 9 N.W.3d 812, 815 (Minn. 2024).

The first step of this analysis is identifying the circumstances proved. *Id.* To do so, appellate courts "winnow down" the evidence from trial, "resolving all questions of fact in favor of the jury's verdict" and "disregard[ing] evidence that is inconsistent with the jury's verdict." *State v. Colgrove*, 996 N.W.2d 145, 150 (Minn. 2023) (quotations omitted). It is "assume[d] that the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Friese*, 959 N.W.2d 205, 214 (Minn. 2021) (quotation omitted).

The second step is determining whether the circumstances proved "are consistent with guilt and inconsistent with any rational hypothesis other than guilt." *Isaac*, 9 N.W.3d at 815. At this step, appellate courts "examine independently the reasonableness of the inferences that might be drawn from the circumstances proved." *State v. Moore*, 846 N.W.2d 83, 88 (Minn. 2014) (quotation omitted). No deference is given to the choice made by the jury between reasonable inferences. *State v. Segura*, 2 N.W.3d 142, 155 (Minn. 2024). The evidence is viewed as a whole, rather than "as discrete and isolated facts." *State v. Hassan*, 977 N.W.2d 633, 640 (Minn. 2022) (quotation omitted).

"To sustain the conviction, the circumstances proved, when viewed as a whole, must be consistent with a reasonable inference that the accused is guilty and inconsistent with

any rational hypothesis except that of guilt." *State v. Harris*, 895 N.W.2d 592, 601 (Minn. 2017). The circumstantial evidence must form "a complete chain" that "leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Allwine*, 963 N.W.2d 178, 186 (Minn. 2021) (quotation omitted). "Inconsistencies in the state's case or possibilities of innocence do not require reversal of a jury verdict so long as the evidence taken as a whole makes such theories seem unreasonable." *State v. Ostrem*, 535 N.W.2d 916, 923 (Minn. 1995).

Applying the two-part test here, we first identify the circumstances proved. In our factual summary above, we described the circumstances proved that are relevant to establishing that Morris was the masked shooter. We therefore do not repeat them here.

We next examine the reasonableness of the inferences from the circumstances proved. Morris contends that there were several "fatal disconnects" in what is needed to form a "complete chain" of circumstantial evidence proving his identity as the shooter. In so arguing, Morris places heavy emphasis on the mask evidence. He contends that it requires "unreasonable speculation" to infer that the mask found in J.S.'s apartment was the same one worn by the shooter on July 6 because the distinctive red lettering on the mask that the police found is not visible in the footage of the shooting.

Morris also challenges the reasonableness of inferences to be drawn from other pieces of evidence, arguing as follows. The presence of DNA in the Sentra does not reasonably support an inference of guilt because Morris was known to be a driver of the vehicle and DNA can remain in a vehicle for years. The cellphone evidence around the time of the shooting does not unerringly point to his guilt because the state did not prove

9

that he was with his cellphone at that time and cellphone data cannot place an individual in a specific location. The fact that Morris took screenshots of a post and a news article about the shooting is reasonably explained by the likelihood that he would be interested in the shooting because it involved his friends. The fact that he had an image on his phone of a firearm suspected to be that of the masked shooter is reasonably explained by his discussion of trading a MAC firearm before the shooting. The surveillance footage of the fight at the gas station the day before the shooting does not support an inference of a motive of revenge on Morris's part because, in the recording played for the jury, Morris was not fighting anyone.

Morris also argues that the circumstances proved are consistent with at least one rational hypothesis other than his guilt—namely, that the individual using the Facebook name "John Wick," whom Morris messaged on the day of the shooting to "meet [him] at spot" at 6 p.m., was the shooter. "John Wick," according to Morris, could have been one of the people who were involved in the gas-station fight and therefore had a motive for revenge. Under Morris's theory, "John Wick" met Morris at "the spot"—which was J.S.'s residence in Sartell—and Morris gave "John Wick" the Sentra to drive, gave him the MAC firearm pictured on Morris's phone, and left his phone in the Sentra. "John Wick" then drove to St. Cloud and participated in the shooting.

Morris's arguments are unpersuasive. As discussed above, footage of the shooting shows that the driver who exited the Sentra wore a white balaclava-style mask over most of their face and that they had a hood pulled over their head. The hood obscured both sides of the mask from view, meaning that the footage does not prove that the shooter's mask

10

had red lettering on its side. Given other similarities in the color and style of the mask found in J.S.'s apartment to the one worn by the shooter, it is reasonable to infer that it was the same mask. Additionally, the timing and location of the police's discovery of the mask does not preclude a reasonable inference that it was tied to the July 6 shooting or to Morris. The vehicle driven by the masked shooter was frequently driven by J.S., who resided in the apartment where the mask was found. Further, Morris was present when the police conducted the search that uncovered the mask.

In addition, Morris's theory that "John Wick" was the shooter depends on the circumstances proved being treated as "discrete and isolated facts," rather than considering the evidence as a whole. *See Hassan*, 977 N.W.2d at 640. Here, as the state argues, the evidence as a whole tied Morris to the Sentra, the white balaclava mask, the two other gunmen, and the type of firearm and ammunition used in the shooting. In addition, the data associated with Morris's cellphone showed movements consistent with Morris driving from Sartell (where J.S. lived) to St. Cloud just before the shooting. To believe Morris's theory, one would have to engage in "conjecture and speculation" that is not supported by the circumstances proved. *See State v. Scharmer*, 501 N.W.2d 620, 622 (Minn. 1993). We therefore conclude that the circumstances proved are consistent with Morris's guilt and inconsistent with any reasonable hypothesis other than guilt. *See Isaac*, 9 N.W.3d at 815.

We are not persuaded otherwise by Morris's citation of two cases in which the supreme court reversed convictions due to insufficient circumstantial evidence: *Scharmer* and *State v. Webb*, 440 N.W.2d 426 (Minn. 1989). In *Scharmer*, the supreme court determined that inconsistencies between an eyewitness's physical description of the person

11

who committed a burglary and Scharmer's physical appearance showed that the conviction was based on "conjecture and speculation" rather than "reasonable inferences." 501 N.W.2d at 621-22. And in *Webb*, the supreme court reversed a murder conviction in part because there was no physical evidence that directly tied the victim of a homicide to Webb. 440 N.W.2d at 431.

But, as the state persuasively argues, this case is distinct from *Scharmer* and *Webb* because neither of those cases involved physical evidence that directly linked the appellant to the crime and, here, there is such evidence in the form of the mask found in J.S.'s apartment and the DNA evidence obtained from the Sentra. This case, as the state argues, is closer to *Robertson*. In *Robertson*, the supreme court affirmed a conviction for first-degree murder, concluding that circumstantial evidence was sufficient to support the conviction partly based on Robertson's admission that he owned a pair of distinct "autumn-colored" Timberland boots that were found in his home and that matched an eyewitness's description of the shooter's footwear. 884 N.W.2d at 870-72. As the state observes, the white mask found in J.S.'s apartment is strong circumstantial evidence, similar to the boots in *Robertson*, supporting a reasonable inference of Morris's guilt.

In sum, when the circumstances proved are viewed as a whole, the only reasonable inference is that Morris was the masked shooter. The evidence is therefore sufficient to support Morris's convictions for aiding and abetting attempted first-degree murder.

**Affirmed.**